**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rogest PACKER, Defendant–Appellant.**

No. 93–2372.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 15, 1993.

Decided Jan. 31, 1994.

Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Michael Holzman, Rosen & Holzman, Waukesha, WI (argued), for defendant-appellant.

Before CUDAHY, FLAUM, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

In this case, Rogest Packer ("Defendant") stands convicted of violating 18 U.S.C. § 922(g)(1) (felon in possession of a firearm). During his trial Defendant motioned to suppress the shotgun and other evidence seized by the police during an investigatory stop. After the district court denied this motion, Defendant entered a conditional plea of guilty, reserving the right to appeal the denial of his suppression motion. Fed.R.Crim.P. 11(a)(2). Here Defendant so appeals. We reverse Defendant's firearm conviction holding that the district court should have suppressed the evidence seized by police at the investigatory stop, and remand this case for further proceedings consistent with this opinion.

## I.   Background

On December 22, 1992, shortly after 1:00 o'clock in the morning, the Milwaukee Police Department received a citizen's telephone call reporting a suspicious vehicle, described as a yellow Cadillac with four black male occupants, on the 2600 block of N. 25th Street in a predominantly black neighborhood. Officers Diane Wiesmueller and Franklin Gayle received the dispatch and Officer Mark Buetow responded as backup. Officer Buetow arrived at the location first, drove past and observed a greenish Cadillac, and then parked some distance away from the vehicle to wait for the arrival of Officers Wiesmueller and Gayle. Arriving two minutes later in a police van, Wiesmueller and Gayle pulled directly behind the Cadillac and activated the white "take down lights" on top of the van to illuminate the Cadillac. At the same time, Officer Buetow pulled his police car in front of and facing the Cadillac such that the Cadillac could not quickly exit from the parked position. Wiesmueller and Gayle exited the van and proceeded toward the Cadillac. The officers' testimony and the occupants' testimony diverges from this point.

The officers testified that they intended to conduct a field interview; that is, to ask such general questions as whether they lived in the area and their reasons for being there, and to explain that a complaint had been made with respect to their presence in the area. Officer Wiesmueller approached the Cadillac on the driver's side, pointing a flashlight at the vehicle and focusing her attention on the driver and the passenger directly behind the driver. As she approached, she asked the occupants of the Cadillac to put their hands in the air where she could see them. Moments later, she heard a car door open and heard Officer Buetow yell "gun." She then drew her weapon and stepped back. Up to this point, she did not ask the occupants any questions.

Meanwhile, Officer Buetow was approaching the front of the vehicle on the passenger's side with his flashlight out and Officer Gayle had taken up a position on the same curb side two feet behind and three feet to the rear bumper of the vehicle. Neither of the officers had their weapons drawn. Officer Buetow testified that the vehicle's occupants, including their facial characteristics, were relatively visible. Both officers saw the

rear right door open and observed Defendant exit through the open door. As Defendant put his right foot out of the car, Officer Gayle saw a dark, pipe-shaped object protruding approximately two inches from Defendant's unzipped knee-length coat alongside Defendant's right leg. Officer Gayle told Officer Buetow that he thought he saw a gun.

Officer Gayle saw more of the object as Defendant emerged further from the car with his coat swung open. Believing the object to be a gun, Gayle reached into Defendant's coat, grabbed the object, and yelled "gun." At the same time, Officer Buetow grabbed Defendant's right wrist to prevent Defendant from reaching for the shotgun. Defendant's body was not completely out of the vehicle at that point. Officer Buetow testified that it was a matter of seconds between the time he parked the police squad and the time he grabbed Defendant. Buetow then handcuffed Defendant and conducted a search of Defendant and the car.

None of the officers had asked Defendant to exit the car, although Officer Buetow stated in the police report that Defendant was removed from the car. At the hearing, Officer Buetow explained that what he meant to convey was that he took control of Defendant as he was emerging from the vehicle. The officer also testified that although he described the color of the Cadillac as green in the police report, the color appeared yellow from a distance under the street lighting.

The occupants of the vehicle testified that the windows were foggy and even with the police lights shining on the car, they speculated that the police could not see in their car. According to the occupants, they had been at the location where the car had stalled, for about one and a half hours, and were about to leave when the police vehicles arrived. The driver, Carl Wesley, testified that Officer Wiesmueller told him to turn off the car and had her hand on her holster as she approached.

Contrary to the officers' testimony, Defendant testified that his coat was zipped while he was sitting in the car, and that he had a

shotgun hidden between his legs.[1] According to Defendant, one of the officers asked him for identification and when he responded that he had no identification, the officer told him to get out of the vehicle and to put his hands up. The officer then searched him, discovering the shotgun. Michael Johnson, who was sitting next to Defendant, testified that he heard Officer Wiesmueller ask Wesley for his license and question why they were there. According to Johnson, he also heard an officer, whom he believed to be Wiesmueller, tell Defendant to leave the vehicle. However, Johnson did not hear any officer ask Defendant for his identification.

In denying the motion to suppress the evidence seized during the stop, the district court found that the degree of intrusion was minimal given that the Cadillac had been parked there for more than an hour and that the occupants made no attempt to communicate their intention to leave. The district court further found that there was a sufficient degree of suspicion to justify the intrusion because of the report of a suspicious vehicle, the lateness of the hour, the fogged car windows, and the officers' reasonable belief that the Cadillac was the one reported in the dispatch. After considerable review and reflection, we are unable to agree with the district court's finding.

## II. Analysis

■ This court reviews a denial of a motion to suppress evidence for clear error, and will not retry issues of fact or substitute the district court's judgment with respect to such issues if the factual findings are amply supported by the record. *United States v. Adebayo*, 985 F.2d 1333, 1337 (7th Cir.1993); *United States v. Spears*, 965 F.2d 262, 268–271 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). The district court found the testimony of the officers more credible than that of the occupants of the automobile, and the record clearly supports this factual determination. *See United States v. Cardona–Rivera*, 904 F.2d

1. During the evidentiary hearing, Packer demonstrated, with the same coat and the same 18–inch long shotgun, how he exited the car. With the

coat zipped, the shotgun did not protrude from underneath the coat as Packer was standing up.

1149, 1152 (7th Cir.1990). Nevertheless, Defendant argues that the police's intervention amounted to a seizure in violation of the Fourth Amendment because it was allegedly conducted without a reasonable and articulable suspicion.

■ A police intervention may be a seizure if, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991); *McGann v. Northeast Illinois Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1185 (7th Cir.1993). Factors relevant to this determination include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *McGann*, 8 F.3d at 1185. Two categories of seizure come within the meaning of the Fourth Amendment: an investigatory stop, which is limited to a brief and non-intrusive detention, and an arrest. *United States v. Adebayo*, 985 F.2d 1333, 1337 (7th Cir.1993); *United States v. Withers*, 972 F.2d 837, 841 (7th Cir.1992).

■ In this case, the officers' vehicles were parked both in front and behind the Defendant's car with the "take down" light shining through Defendant's windows. As Officer Wiesmueller approached the car with a flashlight, she asked the occupants to put their hands in the air where she could see them. While the officer's prudential procedures are of course fully justified by concerns for police safety,[2] a reasonable person in Defendant's position would not feel that he was free to leave. In any event, while stating that the intrusion was minimal, the district court recognized that an investigatory *"Terry"* stop had occurred. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Lechuga*, 925 F.2d 1035, 1039–40 (7th Cir.1991) (police officer's placement of their vehicles directly in front of and directly behind defendant's vehicle is an investigatory stop); *United States v. Pavelski*, 789 F.2d 485, 488–89 (7th Cir.), *cert. denied*, 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986).[3]

**2.** It is a regrettable fact of life in late–20th century America that police officers justifiably are concerned for their safety, and, indeed, their lives, when they approach citizens in the course of routine traffic stops. A newspaper database search of the six months prior to the submission of this case reveals numerous instances of violent roadside attacks by motorists on police officers, some of which are described parenthetically below. *See, e.g.,* "Manhattan Beach Officer is Fatally Shot," *Los Angeles Times*, Dec. 29, 1993, at A1 (officer gunned down by motorist he had pulled over outside shopping mall; one of at least fifteen officers killed or wounded by motorists in routine traffic stops over past five years in Southern California); "Second Man Convicted in Va. Trooper's Slaying; D.C. Resident Grins on Hearing His Fate," *Washington Post*, Nov. 17, 1993, at D3 (defendant convicted of murder in roadside slaying of Virginia State trooper during routine traffic stop); "Two Plead Not Guilty in Shooting of Long Beach Officer," *Los Angeles Times*, Aug. 11, 1993, at B3 (officer in critical condition after gunman shot him three times, once in the head, during a routine traffic stop); "Jurors Don't Accept Teen's Rap Defense," *San Diego Union–Tribune*, July 15, 1993, at A5 (Texas jury sentences to death a teenager who claimed hard-core rap music inspired him to gun down a state trooper during a routine traffic stop); "Po-

lice, Family Bury Officer Killed on Job," *Philadelphia Inquirer*, June 24, 1993, at B1 (one officer shot to death and his partner wounded during routine traffic stop). In light of these realities, precautionary procedures such as those employed by the officers here (the use of "take down" lights, requests to place hands in the air, etc.) unquestionably are reasonable when making traffic stops.

**3.** In *Pavelski*, this court said that a reasonable person would not have believed that he was free to leave when the appellants' car was bounded on three sides by patrol cars in a parking lot, and when it was doubtful that "appellants could have maneuvered their car out of the parking lot." While the manner of detention in this case is somewhat dissimilar to that in *Pavelski* in that the vehicle was only blocked on two sides, the difference may not be significant because the Cadillac was parked next to a curb with its egress effectively blocked on that side. Moreover, one of the three patrol cars in *Pavelski* was twenty to thirty feet in front of the appellants' automobile which presumably would allow more room for maneuvering than that in Defendant's case. Although the district court found that there may have been room for the driver to maneuver the car out as in a parallel park situa-

Having concluded that the officers intervention amounted to a *Terry* stop, we must next analyze the limited degree of intrusion permissible under the Constitution. While the district court found that the officer's intrusion was materially less than the diversion of a vehicle in transit and slightly more than an encounter with a pedestrian, *see United States v. Mendenhall,* 446 U.S. 544, 556–57, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980), the district court concluded that the intrusion was sufficiently minimal when balanced against the degree of suspicion and concern over the officer's safety. *See District Court Order* at 9 ("the location, the number of occupants in the vehicle and the color of the vehicle, the officers were reasonable in proceeding with an investigatory stop."). It is this holding of the district court, the reasonableness of the *Terry* stop, that we must review.

■ The *Terry* test, as it has become known, focuses on to what extent was the investigatory stop justified such that it may lead to admissible evidence. In *Terry* the Supreme Court teaches that the essence of good police work is to adopt an intermediate response that is less rigid than the formal probable cause requirements. *Terry,* 392 U.S. at 15, 88 S.Ct. at 1876, *see also Adams v. Williams,* 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1922–23, 32 L.Ed.2d 612 (1972) ("A brief stop of a suspicious individual, in order to ... maintain the status quo momentarily while obtaining more information, may be most reasonable"). However, before such a stop can provide admissible evidence, law enforcement officers "must be able to point to specific and articulable facts" sufficient to give rise to a reasonable suspicion that an individual has committed or is committing a crime. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879; *McGann,* 8 F.3d at 1186. This court uses a totality of the circumstances test in deciding whether the officer's suspicion was reasonable enough to allow the admission of the seized evidence. *Pavelski,* 789 F.2d at 489.

■ In this case, the police officers went to the scene based on a citizen's call reporting a suspicious vehicle parked, at 1:00 o'clock in the morning, along the street. The district court found that the officers had a "sufficient degree of suspicion" to justify the stop because of the citizen's report, the lateness of the hour, the fogged car windows, and the officers' reasonable belief that the Cadillac was the one reported in the dispatch. Although the early morning hour undoubtedly adds to the reasonableness of the officers' suspicion that perhaps something unusual may have been afoot, the record does not suggest any specific irregularities in the car, other than the windows being all fogged up with the four individuals sitting inside. While the car had in fact been parked there for more than an hour, other than the opaque mist on the windows, no evidence shows that the officers were aware of how long the car had been parked.

In cases where *Terry* stops were found to be justified by reasonable suspicion, the law enforcement officer generally has observed or has received a report of more suspicious activities than four men sitting together in a parked car at the wee hours of the morning. *See, e.g., Adams,* 407 U.S. 143, 92 S.Ct. 1921 (investigatory stop of a suspect in a parked car sustained where officer had been advised by an informant that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist"); *Lechuga,* 925 F.2d 1035 (informant's tip plus pattern of defendant's activity, including counter-surveillance driving, warranted investigatory stop of defendant's vehicle); *United States v. Rideau,* 949 F.2d 718 (5th Cir.1991) (officer observed defendant at nighttime in dark clothing in roadway and defendant stumbled as he stepped from the road; detention to fulfill community caretaking function proper); *United States v. Lyles,* 946 F.2d 78 (8th Cir.1991) (investigatory stop lawful where officers acting on tip about drug sales saw defendant's car in front of the premises in high drug activity area, and observed occupants acting suspiciously and bending down as they shined a flashlight into vehicle, which

tion, it still seems unlikely that a reasonable person placed in a spotlight and knowing that he was the focus of police attention would believe

that he was free to maneuver his car out of the parking space.

then started to drive away). Moreover, in the instant case the officers were not aware of any specific crime being committed in the area. *Cf. United States v. McKie,* 951 F.2d 399 (D.C.Cir.1991) (investigatory stop lawful where defendant was "observed walking with and talking to a suspected drug dealer at the very time and in the very place of the suspected drug dealing"). Nor did the officers' decision to stop the vehicle rely on the general level of the neighborhood's crime rate. While stating that there was "generally crime happening" in the area, Officer Buetow testified that it was not a factor in the officers' decision to approach the vehicle. *Cf. United \States v. Briggman,* 931 F.2d 705 (11th Cir.1991) (investigatory stop justified where officer observed defendant's car parked at 4:00 a.m. near commercial buildings in a high crime area).

The Supreme Court has held that an anonymous telephone tip, if corroborated by independent police work, could exhibit sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop. *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). However, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 329, 110 S.Ct. at 2416. The telephone call in this case simply reported that a "suspicious" Cadillac was parked at a certain location with four black men sitting inside. While the word "suspicious" suggests by itself at least a modicum of questionable activity, the caller did not describe any definite wrongdoing in progress. Thus, although the caller's description of the vehicle and its location was corroborated by police observation, the police lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct.

Alongside our holding today, we acknowledge the reality of the mean streets that police officers face every day in their struggle with the criminal element of our society. Police officers such as Buetow, Gayle, and Wiesmueller regularly risk their lives in the interests of public safety, and yet at the same time they are required to justify their con-

duct. We commend these officers for their diligent response to the citizen's report of concern; however, the evidence obtained from Defendant must still be excluded. While from the relative seclusion of our bench we cannot sufficiently appreciate the difficult circumstances faced by the officers on the beat, we are still required to make what may appear to some as fine legal distinctions. Admittedly, these distinctions are more readily made by a court, with the benefit of briefs and hindsight, than on the street where life and limb are at stake.

Thus, with all this in mind, from the vantage point of judges in the quiet of their chambers, we are compelled to hold that the manner in which the officers approached Defendant exceeded the outer boundaries of a consensual police-citizen encounter. In order to protect the constitutionally guaranteed rights of us all, the minimum threshold of "specific and articulable facts" sufficient to give rise to reasonable suspicion must be higher, albeit marginally, than those presented here. The Government must justify its intrusions according to the Fourth Amendment. *See Poe v. Ullman,* 367 U.S. 497, 550, 81 S.Ct. 1752, 1780, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Therefore, because the officers' investigatory stop was not fully justified by a reasonable and articulable suspicion as required by *Terry,* the evidence seized during the encounter should have been suppressed by the district court.

### III. Conclusion

For the foregoing reasons the district court's denial of Defendant's motion to suppress is reversed, and this case is remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.