THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RUSSELL J. ERTL, Defendant-Appellee.

Second District   No. 2—96—1076

Opinion filed October 22, 1997.

DOYLE, J., specially concurring.

Timothy W. Johnson, State's Attorney, of Sycamore (Martin P. Moltz and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

T. Jordan Gallagher, of Gallagher & Brady, of Sycamore, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

The State appeals from the circuit court's order granting the motion of defendant, Russell J. Ertl, to quash his arrest and suppress evidence. See 145 Ill. 2d R. 604(a)(1). The State argues that the trial court's ruling is manifestly erroneous. We affirm.

## FACTS

Following the stop of his vehicle on April 17, 1996, defendant was charged with the unlawful use of a weapon (720 ILCS 5/24—1(a)(4) (West 1996)) and disorderly conduct (720 ILCS 5/26—1(a)(1) (West 1996)). At the hearing on defendant's motion to quash and suppress, Deputy Sheriff Anthony J. Grum of De Kalb County testified that,

when he stopped defendant on April 17, 1996, he had observed him driving but did not have a warrant for his arrest. He did not observe defendant violate any laws. When defendant pulled over, he got out of his vehicle. Grum testified that defendant was not free to go.

On cross-examination, Grum stated he was responding to the dispatch of another police vehicle to a residence on Esmond Road where there was a female in the house who was apparently very afraid of defendant.

A recording of the communications traffic was played. The initial dispatch call was actually intended for Deputy Delisio. Grum heard this dispatch. Cindy Ertl called the police and stated, "I'm sorry to bug you, you probably just got a phone call from my ex-husband or my husband, or whatever you want to call him." Cindy and defendant were in the midst of marriage dissolution proceedings. She related that her husband was sitting in the driveway and would not leave. She had just bought out his half of the house, but he had permission to use the shed through September 30. Cindy stated that defendant started "hammering *** on the doors and the patio and yelling that he knew that I was in here *** and he wanted to pick up his mail." She was just going to hand him his mail to get him to go away. He asked if she had taken some water softener pellets out of the shed. She said that her dad had done so. He responded, "[W]ell, you shouldn't have taken those, those were mine." He said he was going to call the police. Cindy said that she and her attorney had started paperwork to get an order of protection and wanted to make the police aware of that.

The dispatcher said that, instead of telling her all of this, she needed to know what the immediate problem was and whether defendant was threatening her. Cindy answered, "I'm sorry. Um, my husband, the order of protection that we were getting *** was because um my father found a loaded gun ready to shoot out in that shed ***." Her husband had locked her out of that shed, and her father got in through a window and found a gun. When the dispatcher asked where defendant was at this time, Cindy replied that he was in the driveway. When asked if he had a gun, Cindy said she did not know.

Cindy gave her name, telephone number, and address on Esmond Road. The dispatcher told her they had not heard from her husband at all. Cindy said she did not have an order of protection. She said she did not know him for the last nine months and he went into rages. She said he had four guns and used to sleep with one by his bed. The dispatcher again stated that she did not need to hear this information and asked for his name and what kind of vehicle he was in. Cindy stated it was a black Dodge Ram with license plate CFIII1.

The dispatcher ascertained that Cindy was in the house with the door locked and said that an officer would be sent out.

The county dispatcher subsequently radioed Zebra-59, giving the Esmond Road address and advised that the "soon to be ex-husband is in the driveway. Has made previous threats to her in the past \*\*\*. She has advised that he's known to have 10-32 [a weapon]. However she does not know if he has one at this time." The dispatcher confirmed that it was a black Dodge truck. Zebra-59 asked Zebra-13 if it would be "10-44 to have Zebra-44 check" and then stated he was headed that way from his location at Lindgren and Plank Road. An officer identified as Zebra-84 (Deputy Grum) called stating he would be en route as he was located at Glidden and Aldrich. He asked for the vehicle's description.

At this point in the recording, Cindy stated, "[H]e used to keep one [a gun] in his console in his car when he had a car or under the seat." The dispatcher replied that there was an extra patrol out already. Cindy said, "Oh good. I just wanted to let you know about the one that was in the shed that my dad unloaded it." Cindy then said that defendant used to carry a gun with him in the truck, but did not know "if he would be stupid enough at this point to do this."

Cindy called again to inform the dispatcher that her husband was going north on Esmond Road and was going back to Kirkland and would be turning on Baseline Road. The dispatcher called Zebra-84 stating that the wife called to advise that her husband was going northbound toward Baseline Road and would be going east toward Kirkland. An unknown police car "930" broke in to ask if any assistance was needed. The reply was, "Negative." Another officer asked, "13 do you want me to go ahead and stop him or uh wait until somebody else is in the area?" The responding officer stated his location and then said, "Why don't you go ahead and stop him and I'll 10-25 your location." The recording continued: "Zebra-44 from 13, if you could 10-25 the complaintant [*sic*] and see if there is any grounds for complaint or anything." The other officer responded, "10-4. I'm almost at Malta and Baseline. I can see Zebra-84's headlights. Do you want me to head over there?" The reply was "Affirmative. We'll head over there and see what we've got."

Deputy Grum testified he was Zebra-84. Based on the description given by the dispatcher, Grum activated his emergency lights and pulled defendant over on Baseline Road, east of Esmond Road. Defendant stopped his truck, got out of his vehicle, walked to the squad car, and gave his license to Grum at his request. Defendant acknowledged that he had just been at his wife's residence on Esmond Road and told Grum about their pending divorce. Defendant

explained that a court order still gave him access to outbuildings on the property. Sergeant Petersen and Deputy Kaminski then arrived. Defendant initially denied having any weapons. Petersen asked if defendant would consent to a search of the vehicle for weapons, and defendant consented. As Grum started to walk toward the truck, defendant said he may have put a .22-caliber pistol in the glove box, but was not sure if it was in there or not. Grum recovered a loaded .22-caliber pistol from the glove box.

On redirect examination, Grum stated he heard the radio traffic and knew the Ertls were not yet divorced. He knew there was no order of protection. He acknowledged that, although the dispatcher had stated that defendant had been known to have weapons, it was not known at this time whether he had a weapon. Grum was not sure if there was any ground for a complaint at the time and conceded that he had no evidence that there had been any crime committed at the residence. Defendant was not at the residence when Grum arrived. Although he heard the transmission that there had been threats in the past, he admitted that he received no information that any threats had been made that day.

After taking the motion under advisement, the court found that the officer had no information that a crime had been committed and could not have had reasonable and articulable suspicion as a basis for the stop.

## ISSUES

On appeal, the thrust of the State's arguments is that the court erred in not finding that the officer who effectuated the stop and arrest of defendant had sufficient knowledge, when considered collectively with that of the other officers working in concert (*i.e.*, imputed knowledge), to support probable cause for the stop, search, and arrest. See, *e.g.*, *People v. Fenner*, 191 Ill. App. 3d 801, 806 (1989) (probable cause or reasonable suspicion to stop may be established from all the information collectively received by the officers acting in concert even if all information is not known to the officer initiating the stop). The State further argues that the search was justified because of defendant's consent and the presence of exigent circumstances. We do not reach the issue of probable cause because we conclude that, after considering all the facts and circumstances, the police did not have a reasonable and articulable suspicion to justify the *Terry* stop in the first place.

## LEGAL STANDARDS

■ A trial court's decision to suppress evidence will not be overturned on review unless the decision is clearly erroneous or is

against the manifest weight of the evidence, that is, unless the opposite conclusion is clearly evident. *People v. Lukach*, 263 Ill. App. 3d 318, 323 (1994). In a motion to suppress evidence, the initial burden is on the defendant to establish that the search or seizure was unreasonable or unlawful. *People v. Scott*, 249 Ill. App. 3d 597, 600 (1993). The defendant must make a *prima facie* case that the police acted without a warrant and that he was doing nothing unusual (*i.e.*, indicative of criminal activity) to justify the intrusion by the police at the time of the stop or arrest. Once the defendant has made this showing, the burden of going forward with the evidence to justify the intrusion shifts to the State. *People v. Drake*, 288 Ill. App. 3d 963, 967 (1997); *Scott*, 249 Ill. App. 3d at 600.

A warrantless search or seizure is deemed unreasonable *per se* unless it comes within a specific, well-delineated exception to the constitutional warrant requirement (*Drake*, 288 Ill. App. 3d at 967), such as when it amounts to a valid investigative *Terry* stop or is based on probable cause coupled with exigent circumstances and making it impractical to obtain a warrant; the ultimate test of the constitutionality of the search or seizure is reasonableness. See *People v. McGee*, 268 Ill. App. 3d 32, 40 (1994); *People v. Crest*, 188 Ill. App. 3d 768, 772 (1989).

■ A warrantless arrest may be made if the arrest is supported by probable cause, that is, when the totality of the facts and circumstances known to the officer are such that a reasonable, prudent person would believe that the suspect is committing or has committed a crime; probable cause is governed by commonsense considerations and concerns the probability of criminal activity. *Scott*, 249 Ill. App. 3d at 601.

■ The test for a *Terry* stop based on reasonable and articulable suspicion is a less exacting one than for probable cause to arrest. *Scott*, 249 Ill. App. 3d at 601. An officer may make a valid investigatory stop of a person in a public place, without probable cause to arrest, when the officer reasonably infers from all the facts and circumstances that the person is committing, has committed, or is about to commit an offense. *Scott*, 249 Ill. App. 3d at 601; *Crest*, 188 Ill. App. 3d at 772. The inquiry concerns whether the officer's conduct was reasonable under the circumstances known to the officer at the time the stop was initiated; the officer's inferences must be based on more substantial facts than would support a mere hunch. *Crest*, 188 Ill. App. 3d at 772. For the police to justify such a detention, they must point to specific, articulable facts which, when taken together with natural inferences, make the intrusion reasonable—such as when the officer observes unusual conduct which leads him reasonably to

conclude in the light of his experience that criminal activity may be afoot. *Scott*, 249 Ill. App. 3d at 601. The reasonableness of the police conduct depends upon balancing the public's interest and the individual's right to personal security free from arbitrary interference by law officers. *People v. Pantoja*, 184 Ill. App. 3d 671, 674 (1989).

## LEGAL PRECEDENTS—TELEPHONE TIPS

■ Where an informant's tip is received by telephone, it may form the basis for a lawful *Terry* stop, but the information must bear some indicia of reliability, and the information upon which the police act must establish the requisite quantum of suspicion. *People v. Yarber*, 279 Ill. App. 3d 519, 528-29 (1996). In other words, the totality of the information available to the police must have a degree of reliability, of quality, and of sufficiency that will sustain a finding of a reasonable and articulable suspicion for the stop. Where the reliability of the information obtained from an (anonymous) informant cannot be easily corroborated and there are no other suspicious circumstances known to the police, a stop may be found unwarranted under the totality of the circumstances. *Yarber*, 279 Ill. App. 3d at 529; see *Scott*, 249 Ill. App. 3d at 602; *People v. Moraca,* 124 Ill. App. 3d 561 (1984). The totality of the circumstances approach for probable cause determinations is applied analogously in the *Terry* reasonable-suspicion context, making an allowance for the lesser showing required to meet this standard. See *Yarber,* 279 Ill. App. 3d at 525-26, 529.

"Informants" were traditionally classified into two major categories: citizen-informant (victim or eyewitness) or paid (police) informant. *People v. Kidd*, 175 Ill. 2d 1, 23 (1996). Information received from private citizens, sometimes referred to as "citizen-informants," was considered presumptively reliable and not subject to the same scrutiny as that received from an informer from the criminal milieu (who was paid for his information). *People v. Hood*, 262 Ill. App. 3d 171, 175 (1994). In *People v. Adams*, 131 Ill. 2d 387, 397 (1989), in discussing probable cause determinations, the supreme court noted that "it matters not by what name the informant is labelled; we look rather to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach."

In establishing the reliability of the information source, the importance of the traditional classifications is now less significant than it once was. *Kidd*, 175 Ill. 2d at 23. Indeed, the information source does not always fit neatly into one category or another. *Kidd*, 175 Ill. 2d at 23 (information was given by person who was not a wit-

ness, victim, or paid informant). The basis of the informant's knowledge remains relevant (*i.e.*, whether from a victim or witness, or whether from a reliable paid informant); however, "the rigidity embodied in the presumptions concerning the classifications is no longer applicable." *Adams*, 131 Ill. 2d at 398. Thus, rather than employing a presumption of reliability based on classification, under the totality of the circumstances approach, a court examines the source of information as one of the relevant factors to be considered. The fact that the information came from the victim or from an eyewitness to the crime affects the weight that is to be accorded in evaluating its reliability. *People v. Aguilar*, 286 Ill. App. 3d 493, 496-97 (1997).

In *Hood*, this court used the more flexible *Adams* approach in reviewing the information provided by two identified "citizen-informants" who had no motive to lie; the court additionally considered the reliability of their statements by noting there was some independent verification or corroboration. *Hood*, 262 Ill. App. 3d at 175.

Based on an evaluation of all the information available to the police at the time, including the source of the information, the question here is whether the police could have reasonably inferred from all the facts and circumstances that the person was committing, had committed, or was about to commit an offense.

In *Moraca*, 124 Ill. App. 3d 561, this court held that a *Terry* stop and search of the defendant and his van were unreasonable where the stop was based on a telephone tip to the police relayed through the CATCH organization. The informant stated that a person named Moraca drove a blue van with a specific license number, had a machine gun in a black pouch, and possessed cannabis in a green bag. The suspect might have a suspended or revoked driver's license and frequented Hickory Street.

The officers observed the van being driven by a male white subject on Hickory Street. Neither officer recognized the driver since they had no description of him, and they saw nothing unusual or suspicious about the van any time prior to the stop. Upon stopping the van, the police opened a black pouch protruding from under the driver's seat and observed what appeared to be a machine pistol. After learning that the driver was Moraca and that his license was suspended, the defendant was arrested, and the police recovered some suspected cannabis.

The anonymous telephone call failed to establish that the informant was honest or reliable or that there was any basis for the informant's knowledge of Moraca's illegal activities. The informant

was unknown to the police and never spoke directly to the officers. There was insufficient corroboration of the informant's tip except for the location of the van and the license number. We concluded that the only corroborated facts known to the police prior to the stop were insufficient to justify a *Terry* stop, and we affirmed the trial court's suppression order. A similar result was reached in *Pantoja*, 184 Ill. App. 3d 671 (information from anonymous citizen caller received by radio dispatch that defendant had a handgun and left a location in a certain vehicle; insufficient facts to corroborate information and officer viewed no suspicious behavior by defendant).

In *City of Lake Forest v. Dugan*, 206 Ill. App. 3d 552 (1990), the officer received a radio dispatch of a citizen's complaint from an identified gas station. The citizen-informant stated he believed the driver of a car that had been in the station was intoxicated and described the car, the license plate, and the occupants. When the officer pulled the car over, the driver stopped immediately; he denied that he violated any laws or that he was driving under the influence.

This court concluded that there were insufficient facts known to the officer to support the informant's conclusion that the driver was driving under the influence. The complainant did not state that the defendant was loud or obnoxious at the gas station or that there was any unusual behavior or poor driving on his part. The officer did not observe any bad driving, and the defendant responded in a timely and appropriate manner when he was pulled over. The informant's facts were conclusory. See *United States v. Packer*, 15 F.3d 654 (7th Cir. 1994) (citizen's complaint about suspicious vehicle lacked sufficient details for stop). The officer's observations did not sufficiently corroborate the complaint to justify the stop where the crucial part of the complaint was that the driver was intoxicated. We therefore affirmed the trial court's order granting the defendant's motion to suppress.

In *People v. Yarber*, 279 Ill. App. 3d 519, an anonymous informant telephoned the Crimestopper's line staffed by the Carbondale police department. The informant claimed that her best friends purchased cannabis on a regular basis at parties from a man named Samuel Yarber. The informant provided a general physical description of the defendant, his dormitory address at the university, and his place of employment. Four hours later, the informant called back to relate that the defendant would leave that day by Amtrak train bound for Chicago to purchase cannabis and would return by train on November 9, 1994. The police confirmed through university law enforcement officials some of the details of the tip, including defendant's status as a student and his residence. Defendant's employer told them the defen-

dant had not worked for several days. A criminal background check confirmed defendant's race, height, and weight. The police were unable to verify that defendant had been on the train on November 8.

When the defendant arrived by train on November 9, he was approached by an officer who called him by name. He produced identification upon request. When questioned, he denied he had drugs. After a limited search of his person yielded nothing, the defendant refused consent to search his two bags and stood by them. It was disputed whether defendant was advised that he was free to go. The detention lasted 15 minutes or more. After learning that a dog trained in narcotics detection was not available, the police seized the defendant's bags and took them to the police station where a dog "alerted" on both of the bags. A search warrant was obtained and two pounds of cannabis were eventually seized.

After observing that the limited *Terry*-stop exception to the probable cause requirement was extended from stops based upon the officer's personal observation to stops based on an informant's tip, the *Yarber* court focused on the veracity, reliability, and the basis of the knowledge as factors in determining the value of an informant's report. The court noted the importance of the officer's corroboration in imparting a degree of reliability to the informant's predictions. Relying in part on *Moraca*, the court concluded, after considering the totality of the circumstances, that there was no reasonable basis for the officers to stop the defendant at the train station.

In *Yarber*, the officers conceded that the only basis for the stop was the anonymous tip. The defendant did not act suspiciously at the time he was stopped. Although the informant provided many details, there was nothing about the tip to establish the basis of her knowledge, and she did not indicate that she had witnessed any criminal activity. Since the informant had not previously given correct information to the police, there was no way to determine her reliability. Although the officers corroborated "innocent" details about the defendant, they were unable to verify independently any of the informant's allegations of criminal activity. Without sufficient verification of the tip, for all the police knew, the defendant was the victim of a malicious prank. The court noted that a reasonable and articulable suspicion must rest on more than the corroboration of innocent details and found that the quality, and not the quantity, of the corroboration was significant in determining whether the officers had a reasonable and articulable suspicion to stop the defendant.

## ANALYSIS

■ Veracity, reliability, and basis of knowledge remain highly rel-

evant in determining the value of an informant's report and in determining that the requisite quantum of reasonable suspicion existed for the police to effectuate a *Terry* stop. *Yarber*, 279 Ill. App. 3d at 525-26. These factors are not to be applied in a compartmentalized, inflexible manner. Under the totality of the circumstances approach, a deficiency in one element may be made up by the strength of another or by sufficient corroboration. *Yarber*, 279 Ill. App. 3d at 525, 529. Information from a victim or an eyewitness to a crime is entitled to particularly great weight in evaluating its reliability. *Aguilar*, 286 Ill. App. 3d at 496-97. However, the mere fact that a citizen is identified will not automatically impart credibility and reliability to his statement, and courts may look to additional factors in evaluating the information. *People v. Jones*, 196 Ill. App. 3d 937, 956 (1990) (noting *Adams*; without more, statement of eyewitness citizen-informant no longer viewed as presumptively or inherently reliable); see *Hood*, 262 Ill. App. 3d at 175 (noting independent verification by police of citizen-informant's information); *People v. Wilson*, 260 Ill. App. 3d 364, 370 (1994) (noting *Adams*; reviewing court suggested information from victim's daughter should have been evaluated by police for veracity and basis of knowledge).

■ In the present case, the informant's name and location were made known to the dispatcher. Though a degree of veracity or credibility would normally attach to the information provided by an identified citizen-informant, the information supplied here was based on limited and somewhat speculative observations and consisted largely of the informant's subjective fears. She tended to rely on information from prior events rather than direct observation of actual criminal conduct. Although pressed by the dispatcher to reveal what immediate threat or criminal conduct defendant was engaging in, the caller could not respond unequivocally that she was then witnessing any criminal or immediately threatening behavior.

The tenor of the call was preemptive and anticipatory and did not impart the type of urgency that would arise from witnessing a crime in progress and thereby suggest a greater degree of reliability. The trial court evaluated the credibility of the recorded and the live testimony. The caller was more concerned that defendant had called the police because her father had broken into defendant's locked shed. Even discounting the caller's possible bias and assuming that the officer's stop should be considered in light of the information provided to the police collectively, the officer was essentially acting on general, "innocent" information concerning defendant, his vehicle, and his location.

The quality and the factual basis of the knowledge provided the

police were insufficient to warrant the stop. Defendant had apparently gone onto the property legally to check his shed and get his mail. There was no order of protection. He was in the driveway at the time of the call and left shortly thereafter. The doors of the residence were locked, and there appeared to be no immediate danger to the informant. She never responded affirmatively and decisively when asked if defendant was threatening her. Although the informant related that defendant had been known in the past to have guns, she could not state that he had one on this occasion. Indeed, the informant herself questioned whether he "would be stupid enough" to have one at this time. The information regarding whether defendant had a weapon was speculative. Although a description of the truck and its location were given, there was no description of the defendant himself.

At the time of the stop, although there was some corroboration of the vehicle's description and location, there were insufficient facts to corroborate that defendant had just engaged or was about to engage in criminal conduct. Officer Grum observed no unlawful or threatening behavior before the stop. The vehicle's description and direction of travel were "innocent" facts even though somewhat predictive of defendant's behavior. The officer conceded that he had no real basis for a complaint and no evidence of criminal conduct or of threats made that day. The recording concluded that the officers were proceeding "to see what we've got."

Defendant immediately pulled over and responded reasonably to the officer's requests. The record does not show that any further information was obtained or verified at the informant's location although there were several officers available to do so. Nevertheless, Grum was requested to stop the vehicle at a time when there was no apparent and immediate danger to anyone. Our review of the law and the facts persuades us that there were no exigent circumstances and no evidence of criminal conduct sufficient to warrant an immediate and warrantless stop of defendant.

## CONCLUSION

A general suspicion or a mere hunch is insufficient to support a warrantless stop. Being insufficiently reliable and detailed, the information here could not provide the quantum of particularized, reasonable suspicion of criminal conduct needed for the stop. See *Packer*, 15 F.3d at 659.

We commend the officers for their diligent response and their concern for public safety. We must nevertheless hold that the evidence was properly suppressed. Even though it may be permissible

for an officer to act on the basis of information collectively available to the police acting in concert, the forcible stop of a citizen cannot be legitimized by the simple expedient of one officer passing on a telephone informant's tip lacking the requisite degree of reliability, quality, factual sufficiency, and corroboration. See 4 W. LaFave, Search & Seizure, § 9.4(h), at 221-25, § 9.4(i), at 232-33 (3d ed. 1996). The totality of the information available to the police collectively must still provide the same quantum of reasonable and articulable suspicion that would be necessary for an individual officer to effectuate a lawful stop. See *Village of Gurnee v. Gross*, 174 Ill. App. 3d 66, 69 (1988). We cannot say that the trial court's ruling was manifestly erroneous or was against the manifest weight of the evidence.

The judgment of the circuit court of De Kalb County is affirmed.

Affirmed.

RATHJE, J., concurs.

JUSTICE DOYLE, specially concurring:

I agree with our majority's conclusion that the trial court was correct in its determination that there was no basis for a stop of defendant's truck. The reason for this determination is plain and simple—the information communicated by the complainant, Cindy Ertl, did not contain sufficient facts to create a reasonable suspicion that defendant had committed, or was committing, any crime. The fact that defendant reportedly "hammered" at the door or, at some time in the past, had made threats or possessed firearms falls short of providing reasonable suspicion that criminal activity was currently afoot.

I believe our opinion should have ended there. Instead, the majority has embarked upon what seems to me to be a confusing discussion, creating a potential for muddling well-established principles in the law of arrest and temporary detention for investigation. Instead of simply discounting the complainant's information as factually insufficient, the discussion focuses heavily on the aspect of her credibility.

For no apparent reason other than that the complainant used a telephone to communicate her information, the majority suggests that the police officers were required to regard her complaint on the same level as information supplied by a confidential informant or an anonymous tipster, concluding, "the forcible stop of a citizen cannot be legitimized by the simple expedient of one officer passing on a *telephone informant's tip* lacking the requisite degree of *reliability,*

*quality*, factual sufficiency, and *corroboration.*" (Emphasis added.) 292 Ill. App. 3d at 875.

Accordingly, the opinion parades out a series of decisions dealing with the special scrutiny requirements applicable when authorities act upon information from confidential or anonymous sources, the cases ordinarily focusing on the need to establish reliability of the source through a prior track record or corroboration of the information. In my view, these cases have no application to the present case, where the source of information was not a confidential or anonymous informant but, rather, an ordinary citizen who identified herself and who claimed to have directly witnessed the events she was reporting.

It has long been recognized that the proof-of-veracity rules applicable to informant cases are inapplicable when the information comes from an identified citizen who is in a position to supply the information by virtue of having been a crime victim or eyewitness. *People v. Bean*, 84 Ill. 2d 64, 68 (1981); *People v. Hoffman*, 45 Ill. 2d 221, 226 (1970); *People v. Hester*, 39 Ill. 2d 489, 514 (1968); *People v. Carroll*, 260 Ill. App. 3d 319, 340-41 (1992); 2 W. LaFave, Search & Seizure § 3.4(a), at 204-24 (3d ed. 1996).

As in *Chambers v. Maroney*, 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975 (1970), the United States Supreme Court has proceeded as if veracity may be assumed when information comes from the victim of or a witness to criminal activity. 2 W. LaFave, Search & Seizure § 3.4(a), at 205. Accordingly, police may ordinarily rely on information from a private citizen who is a victim or witness to formulate probable cause to arrest without verifying that citizen's reliability. *Carroll*, 260 Ill. App. 3d at 340-41; *People v. McCleary*, 208 Ill. App. 3d 466, 478 (1990). A well-recognized exception to this rule exists where police are aware of special circumstances that would make it unreasonable to automatically rely on statements of a witness (*e.g.*, witness known to be mentally deranged or to have a clear motive to fabricate). 2 W. LaFave, Search & Seizure § 3.4(a), at 211-12.

Although any caller who claims to have been the victim of a domestic disturbance might arguably harbor a "bias" in wanting the alleged offender apprehended, this cannot mean that officers may not act immediately on a sufficiently detailed complaint. Hopefully, it is still the law that if police receive a 911 call from an identified woman alleging that her husband has just attempted to strangle her and is now headed south in a specifically described vehicle, responding officers would, without more, have reasonable suspicion authorizing them to intercept and detain the driver of that vehicle for investigation.

Yet, our majority states that, without more, the statement of a citizen who is an eyewitness to a crime is "no longer viewed as

presumptively or inherently reliable." 292 Ill. App. 3d at 873. In defense of my colleagues, I must acknowledge that at least one other court, in *dicta*, has made the same unfortunate statement. See *People v. Jones*, 196 Ill. App. 3d 937, 956 (1990). I believe that this erroneous observation may have been hatched from a fundamental misinterpretation of our supreme court's analysis in *People v. Adams*, 131 Ill. 2d 387 (1989). However, a close reading of *Adams* shows that the court was not addressing the present question of whether police may ordinarily assume veracity when acting on a call from a crime victim or eyewitness. Rather, *Adams* was analyzed in its context of the information having been provided by a paid, confidential informant with no track record for reliability who, unlike an ordinary crime victim or witness, must be subjected to heightened scrutiny. The trial court, however, made the error of mechanically categorizing this informant as an "ordinary citizen" (probably because the police represented that he was not of the criminal milieu), thereby automatically crediting his information as reliable. Second, the informant's information in *Adams* failed to disclose any clear basis for his knowledge that the suspect would be transporting contraband at the time in question; therefore, even if the informant had been an identified citizen-witness, the existence of probable cause would have been questionable absent corroboration. Finally, the efforts of the police to strengthen the conclusory information through investigation were unsatisfactory. Accordingly, in commenting, "the rigidity embodied in the presumptions concerning the classifications [of sources of information] is no longer applicable" (131 Ill. 2d at 398), the supreme court, speaking in the context of an informant case, was merely illustrating the trial court's error in finding that the source's information presumptively established probable cause because of his status as an "ordinary citizen" informant. The arrest could have been upheld only if, in the totality of the circumstances, further investigation had sufficed to corroborate the information.

Certainly, our supreme court, in *Adams*, has continued to follow *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983), in substituting a totality of the circumstances approach for the less flexible *Aguilar* analysis. But, nothing in *Adams* or *Gates* stands for the proposition that police officers would be unjustified in detaining a suspect where, in the totality of the circumstances, their only information is a call from an ordinary victim or eyewitness who has provided sufficient facts from his or her own personal observation to raise a reasonable suspicion that a crime has been perpetrated by the suspect. The totality approach, of course, retains the traditional requirement that the police must consider any known circumstances tending to discredit the witness's veracity.

The overall effect of *Gates*, another anonymous informant case, was to *expand*, not to restrict, the potential for the issuance of a valid search warrant when an element of reliability, viewed independently under *Aguilar* standards, is questionable. By permitting the total circumstances to compensate for a deficiency in the veracity prong, an anonymous or confidential informant's information may still be a viable component of the probable cause determination when, under the previously inflexible *Aguilar* analysis, this deficiency would have been fatal. *People v. Tisler*, 103 Ill. 2d 226, 240 (1984). Accordingly, in *People v. Kidd*, 175 Ill. 2d 1 (1996), our supreme court was able to find probable cause for arrest from the total circumstances in spite of the defendant's argument that "Mrs. Orange must be considered an informant" (apparently because she was not an eyewitness but had worked behind the scenes in cooperation with the police in eliciting admissions from the defendant), and she was of "untested and unestablished reliability." 175 Ill. 2d at 23. Again, however, *Kidd* does not address the present issue of police reliance on information from victims or eyewitnesses to a crime. Our majority's references to cases in which reviewing courts have cited police corroboration of an ordinary eyewitness's information to *further* support a finding of probable cause lend no support to the unique theory that such corroboration is essential. Nothing prevents a court from referring to corroborating evidence or any other facts that might strengthen the finding of veracity. See 2 W. LaFave, Search & Seizure § 3.4(a), at 211.

In my view, it is potentially misleading for our opinion to commingle the nonissue of Cindy Ertl's veracity with our examination of the sufficiency of her information. As an identified eyewitness to the alleged events, with no special circumstances to signal fabrication, her report should have been regarded as presumptively reliable. However, more is required than a reliable witness with an evident basis of knowledge. The witness's report must still contain sufficient facts to create a reasonable suspicion of criminal activity by the suspect. It is there that Cindy Ertl's report fails, and it is that failure that should be the sole basis of our decision to affirm the trial court's suppression order.