EBEL, Circuit Judge,
dissenting.
Although I agree with much of the majority opinion, I must, depart from its reasoning with regard to whether an officer may routinely ask questions about weapons during a traffic stop. I agree with the majority that this circuit analyzes all traf-fie stops according to the principles set forth in Terry v. Ohio, whether the stop is based on reasonable suspicion or probable cause. I further agree that questioning the driver as to whether he was carrying a weapon in the car cannot be justified on the basis of reasonable suspicion in this case. My disagreement with the majority begins with its rejection of a rule allowing routine safety related questions about weapons by an officer during a traffic stop.
I believe officers may routinely ask a detainee during a traffic stop questions that directly pertain to officer safety, provided the questions do not extend the duration or alter the fundamental character of the stop. I recognize there is a point at which questions can become so intrusive that they begin to resemble a full-blown interrogation. At that point, the questions could no longer be justified by non-particularized concerns for officer safety. Cf. United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir.1988) (finding that “intrusive questioning” by an officer during a traffic stop that “any of us would find offensive if it were undertaken by even a best friend, much less a police officer on the highway” violated the Fourth Amendment), overruled on other grounds by, United States v. Botero-Ospina, 71 F.3d 783 (10th Cir.1995). However, in today’s world where violence and guns are so pervasive and where officers risk their lives each time they approach a stopped motorist,[1] I do not believe a simple question regarding the possession of a weapon that does not extend the duration of the stop is so intrusive or offensive as to violate the Fourth Amendment.[2]
*942 The majority opinion first states that an officer may not ask the detainee any questions unrelated to the purpose of the stop, even if the questioning does not extend the normal length of the stop, unless the officer has reasonable suspicion of illegal activity. This assertion misrepresents the law in this circuit. We have held numerous times that officers are allowed during a traffic stop to question a driver about his travel plans. See e.g., United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir.1995) (implicitly allowing questions about travel plans after stopping car for speeding); United States v. McSwain, 29 F.3d 558, 561 (10th Cir.1994) (officer may inquire into identity and travel plans during a routine traffic stop); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir.1989) (holding that an officer can “legitimately ask questions relating to the identity and travel plans of [the occupants of the car] ... regardless of [the officer’s] underlying motivation”). When a car is stopped for speeding or for a straightforward traffic violation, as opposed to being stopped on suspicion that the driver is falling asleep or driving erratically (in which case the officer would be legitimately concerned with how much further the driver intended to travel), it is difficult to explain how questions concerning the travel plans of the occupants are reasonably related to the circumstances which justified the stop. We have allowed, however, an officer to ask these questions regardless of the underlying traffic violation that justified the initial stop.
If we allow officers to question a motorist on topics wholly unrelated to the purpose of the stop, a fortiori we should allow officers to ask motorists questions predicated upon general concerns for officer safety. The principle that an officer can take steps to protect himself during a traffic stop, even when the steps taken are unrelated to the potential crime being investigated, is well-established. The Supreme Court has consistently recognized the “legitimate and weighty” state interest in officer safety, finding it unreasonable to require police officers to take “unnecessary risks in the performance of their duties.” Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In recognition of this paramount interest in officer safety and the “inordinate risk confronting an officer as he approaches a person seated in an automobile,” the Supreme Court has consistently approved protective measures during routine and other lawful investigatory detentions. Id. (establishing rule that officers can require drivers to exit vehicles during a routine traffic stop because of legitimate concern for officer safety without requiring *943 a particularized basis for concern for officer safety); see also Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (permitting police officer making traffic stop to order passengers out of car out of concern for officer safety without requiring a particularized showing of a safety concern).
The circuit courts have further expanded the realm of acceptable police measures that can be taken during a traffic stop in the name of officer safety. This circuit has often allowed officers to make expanded inquiries of motorists during a routine traffic stop in the interest of officer safety. See United States v. Barnes, 156 F.3d 1244, 1998 WL 552427, at *3 (10th Cir. Aug. 28, 1998) (appropriate to order motorist to stand by fence during canine sniff following routine traffic stop) (unpublished); United States v. Hardy, 162 F.3d 1174, 1998 WL 704706, at *1 (10th Cir.1998) (officer could ask motorist if there were guns in a bag from which a motorist began to remove items during a routine traffic stop) (unpublished); United States v. McRae, 81 F.3d 1528, 1535 n. 6 (10th Cir.1996) (allowing officer to ask motorist whether he had a prior criminal record in the interest of officer safety).
Our sister circuits have likewise allowed officers to take various protective measures when conducting a traffic stop, even in the absence of particularized danger to the officer. See e.g., United States v. Little, 178 F.3d 1297, 1999 WL 196515, at *1 (6th Cir. Mar. 24, 1999) (officer allowed to require driver to stand between officer and driver’s car out of safety concerns); Giannola v. Peppler, 142 F.3d 433, 1998 WL 96557, at *3 (6th Cir.1998) (allowing officer to approach vehicle with guns raised in light of “danger police officers frequently encounter during routine traffic stops” and from motorist’s initial reluctance to pull over); Rogala v. District of Columbia, 161 F.3d 44, 53 (D.C.Cir.1998) (officer can require passenger to remain in vehicle); United States v. Moorefield, 111 F.3d 10, 13 (3d Cir.1997) (officer can routinely require passengers to stay in car with hands raised during a traffic stop to promote officer safety); United States v. Stanfield, 109 F.3d 976, 981-83 (4th Cir.1997) (in the interest of officer safety, and recognizing the inherent dangers during traffic stops, officer can routinely open vehicle door and visually determine whether occupants are armed during a routine traffic stop when car has darkly tinted windows); United States v. Packer, 15 F.3d 654 (7th Cir.1994) (approving officer’s procedure requiring motorist to raise hands and shining light through vehicle).[3]
*944 The majority concedes that steps can be taken by an officer during a Terry stop to protect his own safety, but suggests that such steps must be predicated on a particularized fear of officer safety under the circumstances. Again, this suggestion is not supported by the case law. The Supreme Court in Pennsylvania v. Mimms and Maryland v. Wilson adopted a rule that, officers may, as a matter of course, require drivers and passengers to exit the vehicle during routine traffic stops to ensure the safety of the officers, whether or not there is a particularized basis to be concerned about officer safety. Mimms, 434 U.S. at 110-12, 98 S.Ct. 330 (driver); Wilson, 519 U.S. at 413-14, 117 S.Ct. 882 (passenger). This circuit likewise has allowed officers, as a matter of course, to ask motorists about their prior criminal record and to run criminal checks during a traffic stop “largely to protect the officer.” See McRae, 81 F.3d at 1535 n. 6 (“Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person’s criminal record, along with his or her license and registration, is reasonable and hardly intrusive.”). The Fourth Circuit has established a rule that an officer, when required to approach a vehicle with heavily tinted windows, may routinely open a door to visually look for weapons. See Stanfield, 109 F.3d at 981; see also Barnes, 1998 WL 552427, at *3 (out of concern for officer safety, officer can require motorist to stand by fence during canine sniff); Moorefield, 111 F.3d at 11-13 (officers can require passengers to keep hands in air as a routine practice during traffic stops); Packer, 15 F.3d at 657 (same). Thus, courts have already approved a wide variety of protective measures to be conducted as a matter of course during traffic stops, whether or not there are particularized concerns for officer safety and whether or not the officer subjectively feared for his safety.[4]
In holding such measures to be reasonable under the Fourth Amendment, the courts have held that the minimal intrusion into the driver’s personal liberty is outweighed by the state’s justification — the safety of the officer. See e.g., Mimms, 434 U.S. at 110-111, 98 S.Ct. 330. I believe that this case presents a situation where the minimal intrusion into the driver’s personal liberty of asking whether the motorist is carrying a weapon is outweighed by the “weighty and legitimate” interest in officer safety.[5] The Supreme Court noted *945 in Maryland v. Wilson that in 1994 alone 5,762 officers were assaulted and eleven were killed during traffic pursuits and stops. Wilson, 519 U.S. at 413, 117 S.Ct. at 885 (citing Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted 1994 at 71, 33 (1994)). This number has only increased in the intervening years. In 1998, a subsequent version of the Uniform Crime Reports relied upon by the Court in Wilson indicates that 6,242 officers were assaulted during traffic pursuits and stops and nine were killed. See Uniform Crime Reporting Program (1998) at 86, 32. Seventeen percent of these assaults were with dangerous weapons — i.e., knives, guns, etc. Id. at 79. A separate report indicates that nine out of ten homicides of law enforcement officers between 1992 and 1997 resulted from a shooting. See Cindy Clarke & Mark J. Zak, Compensation and Working Conditions, Fatalities to Laiv Enforcement Officers and Firefighters, 1992-97, 3, 4 (1999). Thus, officers face a very real risk of being assaulted with a dangerous weapon every time they approach a stopped vehicle. Against this legitimate safety concern, we must weigh the intrusion into the driver’s personal liberty of a simple question directed at protecting the officer. Given the numerous questions which are allowed already during a traffic stop, i.e., identity, travel plans, request for license and registration, the additional question concerning the possession of possible weapons is de minimis and not unreasonable in the context of the encounter. A traffic stop, after all, is not a social encounter. It is a forceful stop by an officer of a suspected law violator. The increasing violence in our society and the widespread prevalence of guns makes it only prudent and reasonable to allow an officer to inquire about the existence of guns during such an encounter.
One might be concerned about possible Fifth Amendment implications when asking a motorist a question about carrying a weapon. However, the Supreme Court has expressly held that questions asked during a traffic stop do not implicate Fifth Amendment concerns. In Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court held that roadside questioning of a motorist did not constitute custodial interrogation and thus officers need not provide a motorist with Miranda warnings prior to making any inquiries. Id. at 435-41, 104 S.Ct. 3138.[6]
Because I would reverse the suppression of the evidence from Holt’s car, I would also reverse the suppression of evidence obtained from the subsequent search of •Holt’s house. Although I think the search of Holt’s house might be independently justifiable, the government apparently conceded that the search of the house stands or falls with the legality of the search of the car. The government is bound by that concession. However, since I believe there was no improper questioning or detention of Holt, I similarly believe the subsequent search of his home was constitutional.
In my opinion, the majority’s conclusion that officer safety is not sufficient to allow officers to make a simple inquiry to the presence of guns during traffic stops is in error, so long as the traffic stop is not prolonged. Ultimately, in my opinion, this issue warrants en banc review by this *946 court or certiorari review by the United States Supreme Court.

. Between 1989 and 1998 ninety-three officers were killed during traffic stops and in 1998 alone 6,242 officers were assaulted during traffic pursuits and stops. See Uniform Crime Reporting Program: Law Enforcement Officers Killed and Assaulted 1998 at 31, 86 (1998) (hereinafter Uniform Crime Reporting Program (1998)).

. Because I would not authorize the officer to extend the duration of the traffic stop nor to probe into matters that were not directly related to officer safety, I do not believe this rule would run contrary to the Supreme Court authority or Tenth Circuit authority cit *942 ed by the majority opinion. (See majority opinion pages 936-37.) The majority opinion cites Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), for the proposition that the government has the burden to demonstrate that an investigative detention is limited in scope and duration. A question about the carrying of weapons while an officer is waiting for dispatch to check the driver’s license would not extend the duration of the stop. Furthermore, as discussed more thoroughly below, the Supreme Court has allowed officers to take protective measures in the name of officer safety, despite the fact that these steps are unrelated to the potential crime being investigated and thus outside the scope of the officer's reasonable suspicion justifying the stop.
The majority also cites United States v. Jones, 44 F.3d 860 (10th Cir.1995), in which we held that concurrent or subsequent questioning can only be justified on the basis of reasonable suspicion. Id. at 872. In Jones we were not faced with the issue of whether questions could be justified on the basis of concern for officer safety. However, even if officer safety concerns had been raised in Jones, the question asked by the officer in Jones could not have been supported by a safety rationale. The officer in Jones did not ask about possible weapons, but simply asked whether the driver had any drugs in the car. Id. at 863. It cannot be argued that this question was asked out of possible concern for the officer's safety. A question about weapons, on the other hand, has a very logical and obvious nexus to officer safety. In any event, the holding in Jones was only that, under the circumstances there presented, the interrogation about drugs was appropriate and reasonable.

. The Seventh Circuit observed:
It is a regrettable fact of life in lale-20th century America that police officers justifiably are concerned for their safety, and, indeed, their lives, when they approach citizens in the course of routine traffic stops. A newspaper database search of the six months prior to the submission of this case reveals numerous instances of violent roadside attacks by motorists on police officers, some of which are described parenthetically below. See, e.g., "Manhattan Beach Officer is Fatally Shot,” Los Angeles Times, Dec. 29, 1993, at A1 (officer gunned down by motorist he had pulled over outside shopping mall; one of at least fifteen officers killed or wounded by motorists in routine traffic stops over past five years in Southern California); "Second Man Convicted in Va. Trooper's Slaying; D.C. Resident Grins on Hearing His Fate,” Washington Post, Nov. 17, 1993, at D3 (defendant convicted of murder in roadside slaying of Virginia State trooper during routine traffic stop); “Two Plead Not Guilty in Shooting of Long Beach Officer,” Los Angeles Times, Aug. 11, 1993, at B3 (officer in critical condition after gunman shot him three times, once in the head, during a routine traffic stop); "Jurors Don't Accept Teen’s Rap Defense,” San Diego Union-Tribune, July 15, 1993, atA5 (Texas jury sentences to death a teenager who claimed hard-core rap music inspired him to gun down a state trooper during a routine traffic stop); "Police, Family Bury Officer Killed on Job,” Philadelphia Inquirer, June 24, 1993, at B1 (one officer shot to death and his partner wounded during routine traffic stop). In light of these realities, precautionary procedures such as those employed by the officers here (the use of "take down” lights, requests to place hands in the air, etc.) *944 unquestionably are reasonable when making traffic stops.
Packer, 15 F.3d at 657 n. 2.

. United States v. Fernandez, 18 F.3d 874 (10th Cir.1994), in which this court disapproved continued detention of a motorist to inquire whether he possessed a weapon or illegal drugs when reasonable suspicion of criminal activity was not present, is not to the contrary. Id. at 881 n. 6. In Fernandez, the facts of the case make clear that the officer extended the duration of the stop in order to ask the questions about weapons or guns. In the present case, Officer Tucker asked the question about a weapon while he was running the computer checks on Holt’s license. Thus, the question did not extend the length of the stop. Moreover, the questioning there was not limited to weapons, but also extended to drugs, which is beyond the pale of officer safety.
Similarly, United States v. Turner, 928 F.2d 956 (10th Cir.1991) is not to the contrary. Although the officer there asked about guns or drugs, only drugs were found as a result of the consensual search. The gun was discovered later in what appears to have been an inventory search. In any event, in that case we held that the questioning was constitutional because it was both consensual and based on articulable suspicion. Thus, any language about restraints upon an officer questioning about guns was dicta.

. The majority suggests that this is a poor case to announce such a rule because there is no evidence that the officer's question was motivated by fear nor did the government present statistical evidence of the risks generally faced by officers during traffic stops. However, I do not believe an officer needs to establish a reasonable subjective fear before the officer can ask about the presence of guns. Further, this court can take judicial notice of the risks faced by officers when conducting traffic stops. The Supreme Court case law alone provides sufficient evidence of *945 the substantial risks officers face each time they approach a vehicle to conduct a traffic stop. See Mimms, 434 U.S. at 110, 98 S.Ct. 330; Wilson, 519 U.S. at 412, 117 S.Ct. 882.

. The majority asks a hypothetical question about what might occur after the detainee answers the officer’s question about the existence of a gun. That hypothetical, of course, is not presented in this case and so we need not address it here. However, one obvious response is that if a detainee acknowledges possession of a gun the officer can at least respond more cautiously for his own safety, regardless of whether the detainee’s answer has any legal consequences. And, that is the essence of the reason to allow the question in the first place.