# Illinois Official Reports

## Appellate Court

*People v. Green*, 2014 IL App (3d) 120522

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERAMY J. GREEN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0522 |
| Filed<br>Modified upon<br>denial of rehearing | August 26, 2014<br><br>October 2, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In the modification of the appellate court's opinion upon the denial of defendant's petition for rehearing arguing that the appellate court relied on a factual finding not supported by the record and did not properly consider conflicting evidence in reviewing defendant's challenge to the trial court's entry of a directed finding, the original opinion was slightly modified, defendant's conviction was upheld, and defendant's arguments were deemed insufficient to overcome the trial court's findings that defendant's custodial statements were given voluntarily and were reliable and that the investigatory stop that led to defendant's arrest was a valid *Terry* stop. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 09-CF-78; the Hon. Sarah Jones, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier and Christofer R. Bendik (argued), both of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | James Glasgow, State's Attorney, of Joliet (Judith Z. Kelly (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Justices Holdridge and O'Brien concurred in the judgment and opinion. |

## OPINION

¶ 1    Jeramy J. Green (Green), the defendant, was charged with first degree murder. He filed several pretrial motions including a motion to quash arrest and suppress evidence. The trial court granted the State's motion for a directed finding at the close of Green's motion hearing. It found the investigatory stop leading to Green's arrest proper and that the defense failed to shift the burden to the State. It also found the unrecorded portion of Green's custodial interview voluntary and reliable rebutting the inadmissibility provision of section 103-2.1 of the Illinois Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/103-2.1 (West 2008)). Section 103-3(a) of the Code regarding family members was found to be inapplicable. 725 ILCS 5/103-3(a) (West 2008). Green's motion to reconsider was denied.

¶ 2    The case proceeded to a bench trial. Green was convicted of first degree murder and sentenced to 36 years' imprisonment. He appealed the trial court's ruling on his pretrial motion to quash his arrest and suppress evidence. In a decision issued August 26, 2014, this court affirmed the trial court's denial of his pretrial motion and Green's conviction.

¶ 3    Green has filed a petition for rehearing raising two issues with this court's decision: (1) the court relied on a factual finding not supported by the record and (2) this court did not properly factor in purportedly conflicting evidence in reviewing defendant's challenge to the trial court's entry of a directed verdict. The petition is denied with slight modification of the opinion. We have removed the word "recent" as a description of the threats described to Reid by Brittany's parents. A fuller description of the testimony of Detectives Avila, Diehl and Schumacher and a more extensive discussion of the standard for granting a directed verdict have been included. The ruling of the trial court remains affirmed.

¶ 4                                  FACTS

¶ 5    The following account of events is drawn from the testimony at Green's bench trial.

¶ 6    Around 11:30 p.m. on January 7, 2009, Lieutenant Marc Reid (Reid) responded to a dispatch call in Joliet and observed the dead body of Brittany Brooks (Brittany). Through a police database, Reid learned that she had been involved in prior domestic incidents with

Green. Reid also spoke with Brittany's parents and learned of threatening text messages between Brittany and Green.[1] Reid discovered four addresses associated with Green and that a Pontiac Grand Am was registered to him.

¶ 7    After providing them with the information he had regarding the investigation, Reid sent several detectives to each of the four addresses. Reid noted there was no probable cause to arrest Green and no specific information existed at the time directly linking Green to Brittany's death. He assigned Detectives Patrick Schumacher (Schumacher), Moises Avila (Avila), and Stephen Diehl (Diehl) to investigate the house at 1018 Summit, one of the four addresses.

¶ 8    Upon arriving at the house, the detectives did not see Green's Pontiac Grand Am. Avila testified they drove by the front and then the rear of the house checking for vehicles parked in either area that might have occupants sitting with the engine running and lights off either waiting to leave or having just arrived; they found none. He testified that they returned to the front of the house and observed a Honda minivan (minivan) and a Chevy Monte Carlo (car) driving away. He stated that the two vehicles had not been in the front when they originally arrived. He had no knowledge whether the vehicles or persons in them were associated with the house.

¶ 9    Diehl testified that the squad car drove by the front and then rear of the house, he saw the minivan and car parked in the back of the house and also saw them leaving from the back of the house within minutes of the detectives' arrival. He did not see anyone get into the cars but speculated its occupants came from the house since the cars were parked on the property.

¶ 10    Schumacher testified similarly to Diehl, stating that after checking the area around the house for Green's car, he saw two vehicles leaving from the rear of the house. He stated that he could not recall who saw the vehicles first or the details of their discussion at that time about them. He also had no knowledge of who owned the vehicles or who was in them. He radioed dispatch for assistance, providing the description of the vehicles and the direction in which they were heading so they could be stopped and checked for occupants. No traffic violations had been committed.

¶ 11    Officer Daniel Rupp heard the dispatched stop request. He intercepted and stopped the minivan. Rupp exited his car, drew his weapon for general safety purposes, and ordered the female driver, Green's sister, out of the minivan. When she complied, he handcuffed her and placed her in his squad car. She testified that she was driving Green, who was a passenger in the minivan, to the police station.

¶ 12    Sergeant Matthew Breen, having also heard the stop request, exited the police station and drove his car to where Rupp had stopped the minivan. Breen went to the passenger side of the minivan and spoke with a man who identified himself as Green. Although Breen was

---

[1]While there is, in fact, evidence in the record that at least one of the generic threats about which Reid was informed by Brittany's parents had been recent, there is nothing in the record to show that he was actually told that night about the timing or that he factored it into his decision to seek out Green. However, contrary to the defendant's contention, the timing of the threats was not the basis for our holding.

Not knowing whether any of the threatening communications had been recent does not undermine the impact of the officer's knowledge that Brittany and defendant had a history of threatening texts, emails and voicemail messages and a history of domestic violence. Such information in any homicide investigation would make a person "a person of interest."

previously unaware Green was in the minivan, he recognized him as a person of interest relative to Brittany. Breen saw blood on Green's person, ordered him out of the minivan, and handcuffed him for officer safety purposes.

¶ 13        Schumacher, Diehl, and Avila arrived at the stopped minivan. Breen walked Green to Diehl, who noted a large amount of blood on Green's sweatshirt and took it into evidence. Green told Diehl that he had been on his way to the police station to make a statement when the minivan was stopped. Green was then walked to the police station.

¶ 14        At the police station, Reid ordered Diehl to start the recording equipment for the interrogation room, which Diehl failed to do properly.

¶ 15        At 3:23 a.m., Diehl and Avila presented and read Green a waiver of rights form, which Green signed. He agreed to speak with the detectives and did not ask for an attorney. Green was offered food, water, and the opportunity to use the restroom. Diehl noted that Green was in his mid-twenties, had a small cut on his hand but no other injuries, and exhibited no mental deficiencies.

¶ 16        At 4:44 a.m., Detective John Ross (Ross) was assigned to watch the interrogation on the recording computer and discovered that the equipment had not been recording. He started it and notified Reid of the error. Diehl and Avila, who were interrogating Green at the time, were not informed that the first 1 hour and 23 minutes of the custodial interview had not been recorded. They were told of the error when they later left the interrogation room. Diehl was reprimanded for not setting the equipment up properly.

¶ 17        Diehl and Avila both testified that People's Exhibit No. 12, a video recording of Green's interrogation beginning at 4:44 a.m., accurately reflected their entire interview of Green. During the taped portion of the custodial interview, the detectives repeated the first version of events leading to Brittany's final moments that Green had given them during the unrecorded portion. Green never denied providing that account to them and his demeanor remained calm.

¶ 18        The detectives testified that they used profanity and raised their voices in an effort to get Green to display some emotion and admit his involvement in Brittany's death. They told Green several times that the crime scene did not match his story. The detectives admitted they were not trained to use profanity.

¶ 19        Later during the interrogation, Reid provided crime scene photos of Brittany's body which the detectives showed to Green. One of the photos placed directly in front of Green showed only one set of footprints in the snow, countering Green's first exculpatory statement. The other photos of Brittany's body at the crime scene were placed sporadically on the table. After Green repeatedly failed to explain the discrepancies between his story and the crime scene photos, Diehl picked up a photo of Brittany, held it up to Green, and demanded that Green look at Brittany's dead body and explain how she got there.

¶ 20        Diehl later left the room and was replaced by Ross. While Avila and Ross were in the interrogation room, Green gave a second version of events leading to Brittany's death, after which both detectives left the room. Ross reentered a few minutes later with Detective Christopher Schott. Schott told Green he had been listening to the interview and that things did not add up. Schott stated that the police had spoken with his cousin, his sister, and his sister's husband and what they told the detectives did not match Green's story. Green stated several times that he had told his family inconsistent and incomplete stories because of embarrassment. The detectives told Green that his family would understand embarrassment

but not lying and that his family wanted the truth. Ross eventually left the room and Detective Shawn Filipiak took his place.

¶ 21    Green accused Filipiak of spitting in his face. Pushing Green, Filipiak denied spitting on him. Schott intervened. Filipiak offered to leave the room for Green's comfort and then left. Schott was alone with Green. Green was given water, food and allowed to use the restroom.

¶ 22    Schott continued the interrogation and exhorted Green to tell him what happened. The following are excerpts of the discussion.

> "SCHOTT: I said if you don't talk to me about it, I can't–I can't put this–I can't–I can't explain this, all right? And right now, your family wants to know. I mean, they're worried about you. We're worried about what's going on. You've got to explain it. You've already told me that it got out of hand, but you've got to explain to me. You've got to let me know what's going on. So what happened? I'm not–I don't want to sit here and–I'm not (inaudible). I'm not going to sit here and put words in your mouth. I don't want to sit here and make stuff up. I don't want to make a scenario up. I want you to–
>
> GREEN: My family still here?
>
> SCHOTT: Huh?
>
> GREEN: My family still here?
>
> SCHOTT: They're around, yeah. Why? Do you want to see them?
>
> * * *
>
> GREEN: Can I see my family?
>
> SCHOTT: Going to answer my questions?
>
> GREEN: If I answer these questions, can I see my family?
>
> SCHOTT: I'll talk to my boss. You answer the questions and I'll talk to my boss.
>
> GREEN: So if I answer these questions, I'm going to be able to see my family?
>
> SCHOTT: Then I'll talk to my boss.
>
> GREEN: How?
>
> SCHOTT: I said that I'll talk to my boss, but you have to answer the questions and you have to answer them truthfully. You have to give me something to go with. I can't go in there, ask for a favor, if I got nothing to offer. Do you understand? See you gotta tell me the truth so I know what's going on, okay? Did you stab her? Did you?
>
> GREEN: No."

Green continued to insist a third person was there, but acknowledged that he was the one who hurt the deceased. In response to several more denials of involvement, Schott told Green:

> "How am I supposed to let you see your family if you don't talk to me about it; if you don't give me something, which is the truth? You see what I'm saying? You're gonna send me out there with nothing. What am I supposed to do? You understand? See you gotta tell me the truth. You said you unintentionally hurt her, right? Is that what you're saying? I can't hear you. Is that what you're saying?"

Green then admitted stabbing Brittany after she introduced a knife into their argument. Schott left the interrogation room to get Green water and ask his supervisor about allowing Green to see his family. Schott returned to the room to ask more questions, and Green told him where he had dropped the knife after leaving Brittany's car.

¶ 23    After Green used the restroom, Schott asked him to sign a consent form for leave to search his house, but Green refused.

¶ 24                                   ANALYSIS
¶ 25                    Denial of Motion to Quash and Suppress
¶ 26    Green first argues that because the State failed to provide evidence that a reasonable and articulable suspicion existed for the minivan to be seized, the trial court erred in granting the State's motion for directed finding and denying his motion to quash his arrest and suppress evidence. He contends that the case should be remanded for a new trial excluding any evidence gathered as a result of the seizure. We disagree and affirm the denial of Green's motion.

¶ 27    A ruling on a motion to quash an arrest and suppress evidence in the State's favor at the close of defendant's evidence presents mixed questions of law and fact. *People v. Nitz*, 371 Ill. App. 3d 747, 750 (2007). The trial court's findings of historical fact will be upheld on review unless they are against the manifest weight of the evidence, but "a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted." *People v. Lee*, 214 Ill. 2d 476, 484 (2005). The ultimate question of whether to quash and suppress is reviewed *de novo*. *Id*.

¶ 28    A defendant moving to quash an arrest and suppress evidence must make a *prima facie* case that the police lacked probable cause. *People v. Brexton*, 343 Ill. App. 3d 322, 326 (2003). However, as here, when the denial of a motion to quash arrest and suppress evidence is based on the grant of a motion for directed finding, "the trial court does not view the evidence [in the light] most favorabl[e] to the [nonmovant] but, rather, (1) determines whether the [nonmovant] has made out a *prima facie* case, then (2) weighs the evidence, including that which favors the [movant]." *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 311 (2000); see also 735 ILCS 5/2-1110 (West 2008). The trial court's decision will only be reversed if it is against the manifest weight of the evidence. *Zankle*, 311 Ill. App. 3d at 311. Green argues that the initial investigatory stop that ultimately generated the probable cause for his arrest was illegal.

¶ 29    *Terry v. Ohio*, 392 U.S. 1 (1968), sets forth the principles we use to analyze the reasonableness of investigatory stops. Under *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed or is about to commit a crime. *Terry*, 392 U.S. at 22; *People v. Gherna*, 203 Ill. 2d 165, 177 (2003). Determining whether the stop was an unreasonable seizure is a two-step process. *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000). First, we decide whether the stop was justified at its inception; next, we determine whether the scope of the stop was proportional to the circumstances that justified the interference in the first place. *Terry*, 392 U.S. at 19-20; *Sparks*, 315 Ill. App. 3d at 792.

¶ 30    Justification of an investigatory stop at its inception is reviewed objectively. *People v. Thomas*, 198 Ill. 2d 103, 109 (2001). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The officer's suspicion must amount to more than an inarticulate hunch (*Terry*, 392 U.S. at 22; *People v. Close*, 238 Ill. 2d 497, 505, 511 (2010)), but need not rise to the level of suspicion required for probable cause (*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Close*, 238 Ill. 2d at 505, 511). The collective knowledge of all of the officers involved in the apprehension of a defendant, even if such knowledge is not told

to the arresting officer, may be considered by the trial court in determining whether a reasonable suspicion existed. *People v. Hoekstra*, 371 Ill. App. 3d 720, 723 (2007).

¶ 31 Citing *People v. Ertl*, 292 Ill. App. 3d 863 (1997), Green argues that the officers' collective knowledge did not amount to suspicion that is more than an inarticulate hunch. In *Ertl*, the court held that the defendant's estranged wife's police call did not justify a *Terry* stop of the defendant. *Ertl*, 292 Ill. App. 3d at 873. In that case, the wife telephoned the police and advised them that she and defendant had been involved in an altercation at her house. *Id*. The *Ertl* court found that the defendant's stop was not a valid *Terry* stop because (1) the wife's information "was based on limited and somewhat speculative observations and consisted largely of [her] subjective fears"; (2) the wife did not witness the defendant commit any criminal act and could not predict that he was going to do so; (3) the police only corroborated "innocent" details of the wife's tip, including the description of the defendant's vehicle and its location; (4) the officers did not observe defendant engage in any unlawful or threatening behavior before they stopped him; and (5) although "there were several officers" available to go to the wife's location and verify the information she provided, they did not do so. *Id.* at 873-74.

¶ 32 The case at hand is distinguishable from *Ertl*. Unlike *Ertl*, Green was a person of interest in the homicide of Brittany. After interviewing Brittany's family members and checking the police database, the police were aware that Green had sent Brittany threatening text messages and there was a history of domestic incidents between them. Thus, Green had already been implicated in earlier criminal domestic incidents and in threatening further such incidents. Reid dispatched several detectives to find and stop Green because he was a person they "wanted to speak to."[2] So a *Terry* stop of Green at that time would have been a valid stop.

¶ 33 This court also concludes that the stop of the van in which Green was a passenger was a valid stop because the facts known to the police created a reasonable, articulable suspicion permitting a valid stop. Here the police learned of four addresses associated with Green, including the Summit Street house, and knew the kind of vehicle registered to him. Avila testified that their purpose for driving around the address was to look for Green's registered vehicle as well as any other cars that had occupants sitting with the engine running and lights off waiting to leave or having just arrived. Though they did not see Green's Pontiac Grand Am at the house, the three detectives saw the minivan and the car depart from the vicinity of that house at about 3 a.m.–only minutes after their arrival. A reasonable officer could form an articulable suspicion that Green or someone assisting him to evade responsibility for harming Brittany was present in one of those vehicles leaving that specific location. Because they were leaving the area of one of the targeted addresses at 3 in the morning, the two vehicles fit what the officers were looking for in their effort to stop and speak with Green. Although the minivan was not observed engaging in any unlawful or threatening acts, the police had more than a mere hunch to justify its seizure.

¶ 34 The scope of the stop was also proportional to the circumstances. Green, citing *People v. Mendez*, 371 Ill. App. 3d 773 (2007), argues that the address investigated and where the

---

[2]Green's motion for rehearing references only the question as phrased by his counsel to Reid during his testimony at the motion to quash arrest and suppress evidence which concluded that Green was a person Reid felt they "should" talk to. However, in review of the entire testimony, Reid specifically states that he put out a request that Green was someone they "wanted to speak to" and affirmed the State's conclusion that Green should to be stopped in order to be spoken to.

minivan originated were too remote in time and proximity to the crime to justify the later *Terry* stop. Green requests the court to take judicial notice of the exact distance of the house from the crime scene and that the seizure occurred three hours after the crime. Yet, "[t]he size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred," is one of six factors the *Mendez* court indicated could be considered as grounds for stopping a suspect soon after an offense is committed. *Mendez*, 371 Ill. App. 3d at 776 (citing *People v. Brown*, 88 Ill. App. 3d 514, 519 (1980)). The "[k]nown or probable direction of the offender's flight" is also a factor for consideration. *Id.* at 776. In this case, the house the vehicles departed from is one of the four known addresses associated with Green. The detectives were assigned to those addresses because they were probable destinations for Green. According to at least two of the officers, the two vehicles were at the Summit Street house and they left there around 3 a.m.

¶ 35        Additionally, our case is distinguishable from *Reid v. Georgia*, 448 U.S. 438, 439 (1980), the origin of the quote the defendant cites to in *People v. Croft*, 346 Ill. App. 3d 669, 675 (2004). In *Reid*, other than the fact that upon disembarking from a known location, the airplane, the defendant's conduct, "[p]reced[ing] another person and occasionally look[ing] backward at him," is all the police could assert as grounds for the stop. *Reid*, 448 U.S. at 441. The Court stated that the conduct on which the officers relied "[d]escribe[d] a very large category of presumably innocent travelers, who would be subject to virtually random seizures." *Id.* Thus, the stop was not a valid *Terry* stop.

¶ 36        In this case, however, though noting they did not actually know who was in the minivan when they initiated the stop, there was little or no likelihood that a large category of innocent persons would have been affected by a stop in these circumstances. In addition to the incriminating information gathered about Green prior to the detectives' dispatch, the minivan left the house of one of Green's known addresses. Two of the three assigned detectives testified that the minivan was one of the two vehicles they observed leaving from the rear of the house. One of those two detectives testified that he had seen both vehicles parked in the parking lot/driveway at the rear of the house. Although the third detective, who was driving, did not see the vehicles at the rear of the house, he, like the other two, did see the vehicle driving from the front of the house where there had not been anything parked earlier. The detectives described the vehicles and the direction each was traveling in the dispatch. The category of presumably innocent persons potentially affected in the particular circumstance of this case is significantly limited.

¶ 37        Thus, the minivan's seizure was based on a reasonable and articulable suspicion. Since Green does not contest the officer's probable cause to make the arrest after the stop, Green's arrest was valid. Evidence found subsequent to that valid stop and arrest was lawfully obtained.

¶ 38                        Alleged Violation of Due Process

¶ 39        Finally, we briefly address Green's constitutional claim that his due process rights were violated when the trial court failed to include Avila's purportedly conflicting testimony about the location of the vehicles. The trial court's factual findings in its order included the testimony of Schumacher and Diehl that the seized minivan had been parked in the rear of the house and left from there. The court did not include, or presumably consider, Avila's testimony that they observed the vehicles leaving from the front area of the Summit Street house.

¶ 40    Green argues that this constitutes a major discrepancy that the trial court failed to clarify. He cites *People v. Mitchell*, 152 Ill. 2d 274 (1992), and *People v. Bowie*, 36 Ill. App. 3d 177 (1976), as controlling authority. However, these cases are distinguishable.

¶ 41    In *Bowie*, the court held that a defendant is denied due process "[w]here a record affirmatively indicates *** that the trial judge did not remember or consider the crux of the defense when entering judgment." *Bowie*, 36 Ill. App. 3d at 180. In *Mitchell*, the supreme court reversed the judgment of the trial court because, as in *Bowie*, the trial court did not remember the crux of the defense when entering judgment. *Mitchell*, 152 Ill. 2d at 321.

¶ 42    Here, the record reflects that the trial judge interrupted defense counsel during his closing argument to indicate that the court's notes included the deviation in Avila's testimony, thereby showing the testimony had not been forgotten. Moreover, it is doubtful whether the differing testimony of Avila is the crux of Green's defense. He does not argue or even mention this claimed discrepancy in his closing argument at the hearing on the motion to quash arrest and suppress evidence. He notes only Schumacher's testimony of seeing "a couple of cars leaving the scene" and suggests no significance to the variance in the departure locations described by the detectives.

¶ 43    Further, there is no support for Green's contention that the evidence should be viewed in a light most favorable to him, forcing greater weight on Avila's purportedly differing testimony. As previously stated, on a motion for directed finding, the trial court first determines whether the nonmovant made a *prima facie* case, then weighs the evidence. 735 ILCS 5/2-1110 (West 2008); *Zankle*, 311 Ill. App. 3d at 311. This latter step may result in the negation of evidence supporting the nonmovant's *prima facie* case. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155 (1980). The nonmovant's remaining credible evidence must be sufficient to establish the nonmovant's *prima facie* case or the movant's motion should be granted. *Id*. A reviewing court will only reverse the trial court's decision if it is against the manifest weight of the evidence. Here, we do not find that it is.

¶ 44    In our review of the testimony of the officers, it would seem that there is no conflict. Avila does not say the cars did not leave from the back of the Summit Street house. He only stated that he saw the cars leave the area of the front of the residence. This does not conflict with Schumacher's account of seeing the vehicles coming from the rear of the residence because he further testified that he was unsure of who saw the vehicles first or their presumed discussion about them. Additionally, Diehl was the only one to state that he saw the vehicles originally parked in the back driveway of the Summit Street house and then leave from the rear. When viewed together, there is no significance–only a piecemealed account of the location of the vehicles at different times by the officers. The trial court's findings of credibility were not against the manifest weight of the evidence.

¶ 45    For these reasons, we find Green's due process rights were not abridged and the evidence resulting from the arrest could properly be used at trial.

¶ 46                        Admissibility of Unrecorded Custodial Statements

¶ 47    Green argues that the trial court erred in admitting his custodial interview statements at his bench trial because the State was ineffective in sustaining its burden of proving that the statements were voluntary and reliable pursuant to section 103-2.1 of the Code (725 ILCS 5/103-2.1 (West 2008)). He asserts that cumulatively (1) acquiescence to his request to see his

family members conditioned upon him making an inculpatory statement, (2) his subjection to repeated profanity and crime scene photos of Brittany's body, and (3) a custodial interview lasting five straight hours with essentially no breaks resulted in two involuntary and unreliable exculpatory statements and a final inculpatory statement. The State argues it showed by a preponderance of the evidence voluntariness and reliability in the custodial interview statements based on the totality of the circumstances exception provided under section 103-2.1(f) of the Code (725 ILCS 5/103-2.1(f) (West 2008)). We find the State's argument persuasive and affirm the denial of Green's motion.

¶ 48    When reviewing a denial of a motion to suppress, great deference is given to the trial court's findings of fact and due weight is given to inferences reasonably drawn from those facts. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We review only for clear error. *Id.* A court's factual findings are reversed only if they are against the manifest weight of the evidence; however, the question of whether the confession was voluntary is reviewed *de novo*. *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Thus our determination on that issue is made independently and without reference to the trial court's conclusion.

¶ 49    Green's petition for *de novo* review of the entire cause is not appropriate. The trial court was privy to the live testimony. *People v. Valle*, 405 Ill. App. 3d 46, 58 (2010) (noting the role live testimony has in resolving a disputed issue of fact). We defer to its fact finding unless it is against the manifest weight of the evidence.

¶ 50    Section 103-2.1 of the Code requires that statements made during a custodial interview be presumed inadmissible as evidence against the accused in any criminal proceeding brought under section 9-1 of the Criminal Code of 1961 or the Criminal Code of 2012 unless the entire interrogation was electronically recorded and the recording is substantially accurate and not intentionally altered. 725 ILCS 5/103-2.1(b) (West 2008). This is a rebuttable presumption. Section 103-2.1(f) of the Code provides an exception to this presumed inadmissibility if the State shows by a preponderance of the evidence that the statements were voluntarily given and are reliable, based on the totality of the circumstances. 725 ILCS 5/103-2.1(f) (West 2008).

¶ 51    Both parties agree on the following facts. Green was subjected to a custodial interrogation for the crime of first degree murder, a criminal proceeding listed under section 9-1 of the Criminal Code of 2012 (720 ILCS 5/9-1 (West 2012)). Therefore, the Joliet police department was required to electronically record the entire interrogation of Green. However, nothing from the start of the interrogation at 3:23 a.m. until 4:44 a.m., a period of 81 minutes, or 1⅓ hours, was recorded due to Diehl's failure to activate the recorder. Ross started the device at 4:44 a.m. and the rest of the interview was recorded. The trial court found that the failure to record was unintentional. It also held that the initial unrecorded exculpatory statement given by Green was voluntary and reliable on the grounds of Green's lack of objection when Diehl and Avila repeated the original exculpatory statement after the recording was finally started.

¶ 52    While this court might take issue with the *form* of Green's "acquiescence"–mere silence when the officers recounted his alleged, but unrecorded, exculpatory statement during the recorded portion of the custodial interview–this issue is not before us. A silent response to the officers' random recounting of pieces of a story may very well not amount to an "agreement" regarding what had been discussed prior to the start of the recording. However, Green has

conceded that the officers' account was accurate by not only failing to challenge it on appeal but also affirming it in his brief.[3]

¶ 53    Nevertheless, Green does challenge the legal finding of the court that the State sustained its burden of showing that the statements made during the recorded portion of the interrogation were voluntary and reliable. "[T]he test for voluntariness of a statement is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). The assessment is based on the totality of the circumstances. *Id. Gilliam* notes several factors to consider in determining voluntariness such as the defendant's age, education, intelligence, mental capacity, physical condition at the time of questioning, the legality and duration of the detention and questioning, whether the defendant was advised of his constitutional rights, and any physical or mental abuse by police including the existence of threats or promises. *Id.* at 500-01.

¶ 54    Green's first assertion that his final inculpatory statement was conditioned on a promise to see his family while true is without significance. The trial court found that Green was a 23-year-old adult, with prior criminal justice experience, not lacking in mental capacity or physical ability, and not exhibiting diminished intelligence. He does not fit the profile of an adult in need of familial assistance when requested during a custodial interview.[4] He erroneously relies on section 103-3 of the Code (725 ILCS 5/103-3 (West 2008)) and also cites a distinguishable case, *Haynes v. Washington*, 373 U.S. 503 (1963).

¶ 55    Section 103-3 of the Code states that "[p]ersons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner." 725 ILCS 5/103-3 (West 2008). The intention of this section of the Code is to "permit a person held in custody to notify his family of his whereabouts" to enlist their help for procedural safeguards such as hiring an attorney. *People v. Prim*, 53 Ill. 2d 62, 69 (1972); 725 ILCS 5/103-3(a) (West 2008). "[T]his statute does not give the defendant the right to have a member of his family present with him during interrogation or even to visit with him while in custody other than at regular visiting periods." *Prim*, 53 Ill. 2d at 69.

¶ 56    Yet, Green argues that his facts are similar to and possibly worse than those of *Haynes*. From the time he was arrested until his confession 16 hours later, plus an additional several days, Haynes' continuous requests to call an attorney and also to call his wife to inform her of his location and make legal arrangements were disregarded and used as an unfulfilled condition for his inculpatory statements. *Haynes*, 373 U.S. at 511. He was not "advised by authorities of his right to remain silent, warned that his answers might be used against him, or told of his rights respecting consultation with an attorney." *Id.* The court found that the officers' conditioning the ability to speak with an attorney or spouse regarding his whereabouts

---

[3]Green concedes at page 10 of his brief that the account given by the officers is the exculpatory statement he gave during the unrecorded portion of the custodial interview.

[4]*People v. Westmorland*, 372 Ill. App. 3d 868, 880-90 (2007), discusses the Illinois courts' transition to the acceptance of a profound need of parental assistance when requested by newly emancipated offspring as opposed to previous cases holding that an adult's request for assistance should only be honored if the request is made by a licensed attorney familiar with the legal system.

- 11 -

on signing an inculpatory statement was an impermissible method of obtaining a confession. *Id.* at 508.

¶ 57    Here Green's family knew of his whereabouts and why he was being interviewed before the custodial interview started. His sister was the driver of the minivan and testified that she and Green were headed to the police station for Green to give a statement about the events leading to Brittany's death. He was walked into the station from her minivan. Green was also told throughout the custodial interview that his story and the statements given by his family members did not match.

¶ 58    Further, the record does not show that Green's requests for his family were made for legal advice. He signed a waiver of rights form acknowledging he was fully informed of and validly waived his right to counsel. That fact is not contested.

¶ 59    Next, Green argues that the officers' interrogation method was improper. It is improper to use fear or threats to elicit confessions. *Gilliam*, 172 Ill. 2d at 501. However, the profanity complained of by Green, though impolite, contextually amounted to the officers' characterization of Green's account of the events leading to Brittany's death. The crime scene photos were brought in to show that Green's first exculpatory statement did not match the visual evidence at the scene. Though the photos depicting Brittany at the scene were graphic, they were not solely used to elicit a response from Green. They were also used to show that the statement of occurrences given by Green in his first exculpatory statement was not consistent with the crime scene.

¶ 60    Green's final argument points to the length of his interrogation. He asserts he was subjected to six separate officers interrogating him for five hours until he finally gave his inculpatory statement. He argues that he was only given a four-minute break where there were no detectives in his interrogation room and he supports this argument by citing *Spano v. New York*, 360 U.S. 315 (1959). However, we do not believe the Supreme Court was referencing Green's type of conditions when it discussed being overborne by official pressure and fatigue in *Spano*. The defendant in *Spano* was interrogated by 15 law enforcement officials for an uninterrupted eight hours that "began in early evening, continued into the night, and did not bear fruition until the not-too-early morning." *Spano*, 360 U.S. at 322. The only semblance of a break involved moving from one interrogation area to another. *Id*. The defendant was not allowed to speak with the attorney he had already retained and who had delivered him to the custody of the police pursuant to a bench warrant. His confession was found to be involuntary because he was "overborne by official pressure, fatigue and sympathy falsely aroused" by a ruse created by the police and executed by his friend. *Id*. at 323.

¶ 61    Green's custodial interview varies greatly from *Spano*. There is no bright-line rule in Illinois regarding the allowable length of an interrogation. Interrogations lasting six or eight hours do not necessarily render a statement involuntary. *People v. Ramey*, 152 Ill. 2d 41, 58-59 (1992); *People v. Terrell*, 132 Ill. 2d 178, 201 (1989). Green was fully informed of his rights and never requested that the interrogation end or asked for an attorney. He was given several opportunities, which he notes in the facts of his brief, to break for food and water as well as use the restroom. Further, Green stated he was on his way to the police station to give a statement at the time the minivan was seized. Thus, the start of the interrogation was in accord with his alleged timeline. As the trial court noted, the interview length was extended because Green's versions of events continued to change. Therefore, the duration of his custodial interview does

not render his statements involuntary or unreliable because there was no overbearing official pressure or fatigue.

¶ 62    Each of Green's contentions fails on its own merit. Such failings, even when viewed cumulatively, do not overcome the trial court's finding that the State met its burden of proving that Green's custodial statements were given voluntarily and are reliable.

¶ 63                                CONCLUSION

¶ 64    The trial court's ruling is affirmed. The investigatory stop leading to Green's arrest was a valid *Terry* stop. Additionally, Green's custodial statements were given voluntarily and are reliable and could properly be used against him.

¶ 65    Affirmed.