2024 IL App (4th) 231086

NO. 4-23-1086

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 14, 2024
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>            Plaintiff-Appellant,<br>        v.<br>JAIMIE L. WHILES,<br>            Defendant-Appellee. | ) Appeal from the<br>) Circuit Court of<br>) Stephenson County<br>) No. 23DT21<br>)<br>) Honorable<br>) James M. Hauser,<br>) Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        The circuit court of Stephenson County granted (1) a motion by defendant, Jaimie L. Whiles, for the suppression of evidence and (2) a petition by him to rescind the statutory summary suspension of his driver's license. Having filed a certificate of impairment, the State appeals. In our *de novo* review, we hold that the doctrine of collective knowledge defeats defendant's motion and petition. Therefore, we reverse the court's judgment and remand this case for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3        On April 2, 2023, a Stephenson County deputy sheriff, Mevludin Aliu, pulled defendant over and issued him three uniform traffic tickets: one for driving under the influence of

alcohol (DUI) (625 ILCS 5/11-501(a)(1), (5) (West 2022)), another for driving an uninsured vehicle (*id.* § 3-707), and another for illegally transporting alcohol (*id.* § 11-502).

¶ 4    Because chemical testing revealed that defendant had a blood alcohol concentration of more than 0.08 (specifically, 0.166), statutory law required the summary suspension of his driving privileges. See *id.* § 6-208.1(a)(2).

¶ 5    Defendant petitioned the circuit court to rescind the statutory summary suspension. One of his claims in support of the proposed rescission was that "[t]he arresting officer did not have reasonable grounds to believe that the defendant was driving *** while under the influence of alcohol or drugs."

¶ 6    Also, defendant moved for the suppression of any evidence the State had obtained because of the traffic stop. Such evidence was inadmissible, the motion argued, because Aliu had lacked "reasonable grounds for making the stop."

¶ 7    At the hearing on the petition and motion, the defense called Aliu to testify. On April 2, 2023, around 7:37 p.m., to quote from his testimony, he "received a call about a possibly intoxicated driver" heading east on United States Route 20. Aliu "pulled into a turnaround" and watched for a "red Jeep." He recounted, "I observed a red Jeep[,] and the vehicle behind it flashed its headlights at me. The vehicle was a fully marked Paw Paw patrol vehicle." Paw Paw, Aliu noted, was in Michigan, and a Paw Paw police officer had "no jurisdiction" in Illinois.

¶ 8    Aliu continued:

"A. I got behind the vehicle, insured it was the correct vehicle, the correct license plate, and initiated a stop. The vehicle at first didn't pull over right away, I hit the sirens quick, and the vehicle began to pull over.

\* \* \*

Q. Prior to pulling over the vehicle did you observe any violations of the Illinois Vehicle Code?

A. I did not.

Q. Okay. And you said you received a call about a possible—possible DUI driving eastbound, correct?

A. Correct.

Q. And that was all the information you had at the time of the stop?

A. If a remember correctly, yes."

¶ 9    On cross-examination, Aliu testified that it was only "[a]fter the fact" that he learned "who the 911 caller was"—namely, "the officer driving the Paw Paw police vehicle." This officer's last name was Ferrion (although the court reporter was unsure how the name was spelled). The prosecutor asked:

"Q. And did you find out why he made that call?

A. I did. So he had observed the vehicle driving erratically and swerving and crossing the center line, the fog line. At one point it almost hit a pole, and then on 20, before it entered our county, it made a complete stop for about I think he said about two seconds. Before continuing again.

Q. Was that stop at a stop sign?

A. No, it was on the highway.

Q. Was it at a red light?

A. No."

¶ 10     On redirect examination, Aliu acknowledged that he "found out all of this information after the fact"—"three days after the fact." "[A]t the time of the stop," he "didn't know" yet what Ferrion had observed.

¶ 11     When Aliu pulled the Jeep over, he noticed it had "damage to the driver's side"—"fresh" damage, not rusted. Initially, the driver of the Jeep, defendant, told the police officers he had hit a deer. Eventually, though, he "confessed to hitting a pole, trying to turn around using the GPS."

¶ 12     After Aliu testified, defense counsel argued that because Aliu "didn't witness anything that would indicate that [defendant] was possibly impaired," and because Aliu "only found out information from the caller three days later *** as far as who the caller was and what exactly the caller observed," the traffic stop was unreasonable and the evidence from the stop should be suppressed.

¶ 13     The prosecutor argued, on the other hand, that Ferrion had probable cause to believe that defendant was impaired and that Ferrion's knowledge should be imputed to Aliu.

¶ 14     The circuit court was unconvinced. Because Aliu had not seen defendant commit any traffic violation, and because the only information that Aliu had at the time of the stop was a message from the dispatcher that a possibly intoxicated driver was eastbound on United States Route 20, the court granted the motion for suppression and rescinded the statutory summary suspension.

¶ 15     The State filed a motion for reconsideration, but the circuit court adhered to its decision.

¶ 16     This appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18        The implied-consent provision of the Illinois Vehicle Code, section 11-501.1(a),
provides as follows:

> "Any person who drives *** a motor vehicle upon the public highways of this State
> shall be deemed to have given consent *** to a chemical test or tests of blood,
> breath, other bodily substance, or urine for the purpose of determining the content
> of alcohol *** in the person's blood if arrested, as evidenced by the issuance of a
> Uniform Traffic Ticket, for any offense as defined in Section 11-501 ***. If a law
> enforcement officer has probable cause to believe the person was under the
> influence of alcohol ***, the law enforcement officer shall request a chemical test
> or tests which shall be administered at the direction of the arresting officer. *** The
> issuance of the Uniform Traffic Ticket shall not constitute an arrest, but shall be for
> the purpose of notifying the person that he or she is subject to the provisions of this
> Section and of the officer's belief of the existence of probable cause to arrest." 625
> ILCS 5/11-501.1(a) (West 2022).

Driving while "the alcohol concentration in [one's] blood *** is 0.08 or more" (*id.* § 11-501(a)(1))
is an "offense as defined in Section 11-501" (*id.* § 11-501.1(a)).

¶ 19        Upon receiving a sworn report of a law enforcement officer that a person refused
to submit to a chemical test or that testing disclosed an alcohol concentration of 0.08 or more, the
Secretary of State must summarily suspend the person's driving privileges. *Id.* § 11-501.1(e).

¶ 20        A person who has received a notice of the summary suspension of his or her driving
privileges may file with the circuit court a request for a hearing—a request that will not delay the
statutory summary suspension. *Id.* § 2-118.1(b). "The request to the circuit court shall state the

grounds upon which the person seeks to have the statutory summary suspension *** rescinded." *Id.* The grounds in the request—and, accordingly, the issues in the judicial hearing on the request—will be limited to the following:

"1. Whether the person was placed under arrest for an offense as defined in Section 11-501, or a similar provision of a local ordinance, as evidenced by the issuance of a Uniform Traffic Ticket, or issued a Uniform Traffic Ticket out of state as provided in subsection (a) of Section 11-501.1; and

2. Whether the officer had reasonable grounds to believe that the person was driving or in actual physical control of a motor vehicle upon a highway while under the influence of alcohol, other drug, or combination of both; and

3. Whether the person, after being advised by the officer that the privilege to operate a motor vehicle would be suspended or revoked if the person refused to submit to and complete the test or tests, did refuse to submit to or complete the test or tests to determine the person's blood alcohol or drug concentration; or

4. Whether the person, after being advised by the officer that the privilege to operate a motor vehicle would be suspended if the person submits to a chemical test, or tests, and the test discloses an alcohol concentration of 0.08 or more, *** and the person did submit to and complete the test or tests that determined an alcohol concentration of 0.08 or more.

* * *

5. If the person's driving privileges were revoked, whether the person was involved in a motor vehicle crash that caused Type A injury or death to another." *Id.* § 2-118.1(b)(1)-(5).

¶ 21 Because the judicial hearing is at the request of the person whose driving privileges have been suspended—let us call this person the defendant—and because the proceeding is civil in nature (see *id.* § 2-118.1(b)), the defendant has the burden of proving, by a preponderance of the evidence, the grounds of the request (see *People v. Huisinga*, 242 Ill. App. 3d 418, 421 (1993)). Pleaders have to prove their pleadings. 1 Robert S. Hunter, Mark A. Schuering, and Julie Schuering Schuetz, Illinois Practice, Trial Handbook for Illinois Lawyers, Civil § 21:5 (8th ed. 2023). Not only is the ultimate burden of proof borne by the defendant, but the initial burden of coming forward with evidence is also borne by the defendant, who must "present a *prima facie* case for rescission." *People v. Orth*, 124 Ill. 2d 326, 338 (1988). "A *prima facie* case is [a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." (Internal quotation marks omitted.) *People v. Howard*, 2022 IL App (3d) 210134, ¶ 14. If the defendant establishes a *prima facie* case for a rescission of the summary suspension, "the burden shifts to the State to present evidence justifying the suspension." *People v. Quigley*, 2018 IL App (1st) 172560, ¶ 21. If, however, the defendant fails to establish a *prima facie* case, the circuit court should direct a finding for the State. *Id.*

¶ 22 There are two ways in which a defendant could fail to establish a *prima facie* case: (1) the defendant fails to prove a critical factual assertion or (2) the defendant proves his or her factual assertions, but those proven facts do not legally entitle the defendant to a rescission of the summary suspension. We defer to the circuit court's resolution of factual disputes insomuch as the court's factual findings are not against the manifest weight of the evidence. See *id.* But the question of whether—given those factual findings—the summary suspension should or should not be rescinded is a legal question and, as such, is one that we answer *de novo*. *People v. Relwani*, 2019

IL 123385, ¶ 18. It follows that if the facts and the credibility of witnesses are unquestioned, our standard of review is purely *de novo*. *People v. Granados*, 332 Ill. App. 3d 860, 862-63 (2002).

¶ 23 The only witness who testified in the rescission hearing was Aliu, who was called by defendant. In the proceedings below, neither defendant nor the State called into question Aliu's credibility. Nor do they do so now. "Nothing in the record suggests that the parties dispute the facts; therefore, our review is *de novo*." *Id.* at 863.

¶ 24 We decide anew, then, whether defendant established a *prima facie* case for a rescission of the statutory summary suspension. Given the testimony that defendant elicited from Aliu, the only statutory ground that plausibly could be regarded as relevant is the second ground: "Whether the officer had reasonable grounds to believe that the person was driving or in actual physical control of a motor vehicle upon a highway while under the influence of alcohol, other drug, or combination of both[.]" 625 ILCS 5/2-118.1(b)(2) (West 2022).

¶ 25 Because of the division of labor in the rescission hearing, whereby the burden of coming forward with evidence rested initially upon defendant (see *Orth*, 124 Ill. 2d at 338), the default setting, so to speak, was that (1) when pulling defendant over, Aliu had knowledge that made that seizure reasonable and (2) when arresting defendant for DUI, Aliu had knowledge that likewise made that seizure reasonable. In his *prima facie* case, defendant had to change that default setting by presenting evidence that, if unrebutted, would prove the negative of (1) or (2). The proof that the defense adduced in its questioning of Aliu did not negate (2) and did not negate the proposition that Aliu acquired probable-cause knowledge after pulling defendant over and interacting with him. In its questioning of Aliu, the defense did not seek to discredit Aliu's statement, in his sworn report, that defendant "had glassy eyes, fumbled [with his identification], couldn't explain where he was coming from, appeared confused, [and] admitted to taking

prescription pills." Instead of challenging (2), which had to do with the ripening of reasonable suspicion into probable cause, the defense went a step backward in the sequence of events and challenged (1), reasonable suspicion. The proof that the defense adduced in the rescission hearing centered on Aliu's reasons for pulling defendant over in the first place. In a rescission hearing, "the motorist may challenge the propriety of *the traffic stop* leading to his or her DUI arrest." (Emphasis added.) *People v. Araiza*, 2020 IL App (3d) 170735, ¶ 15.

¶ 26       The Illinois Supreme Court has given the following guidance on the constitutionality of traffic stops:

"Vehicle stops are subject to the fourth amendment's reasonableness requirement. [Citations.] As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. [Citation.] However, as this court has observed, though traffic stops are frequently supported by probable cause to believe that a traffic violation has occurred, as differentiated from the less exacting standard of reasonable, articulable suspicion that justifies an investigative stop, the latter will suffice for purposes of the fourth amendment irrespective of whether the stop is supported by probable cause. [Citations.] A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. [Citation.] The officer's belief need not rise to the level of suspicion required for probable cause. [Citation.]" (Internal quotation marks omitted.) *People v. Hackett*, 2012 IL 111781, ¶ 20.

Thus, although a police officer needs probable cause before *arresting* someone for DUI (see *People v. Horton*, 2019 IL App (1st) 142019-B, ¶ 65), all a police officer needs to *pull someone over* for suspected DUI is " 'knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed' " DUI (*People v. Richardson*, 376 Ill. App. 3d 612, 617 (2007) (quoting *People v. Lee*, 214 Ill. 2d 476, 487 (2005))). "Probable cause" means that "a reasonable and prudent person, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense." *People v. Fortney*, 297 Ill. App. 3d 79, 87 (1998). By contrast, "[a] reasonable suspicion of criminality— a decidedly lower standard than probable cause—arises when an officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity *may* be afoot.' " (Emphasis in original.) *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 47 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

¶ 27    The State argues that "[u]nder the totality of the circumstances, the stop of defendant's moving vehicle in response to a detailed report of impaired driving to 9-1-1 from an out-of-jurisdiction police officer was thoroughly reasonable."

¶ 28    Defendant counters that before pulling him over, Aliu himself "observe[d]" *no* "unusual conduct" by defendant. Rather, all Aliu observed was defendant driving by in a red Jeep. Defendant notes that, at the time of the traffic stop, "Deputy Aliu and all other on-duty law enforcement officers who were authorized to enforce the laws within the State of Illinois had only extremely limited information." At the hearing on defendant's motion for suppression, "the State conceded that [Aliu] did not know the identity of the caller, his status as an off-duty out-of-state police officer, or what he observed prior to Deputy Aliu['s] initiating a traffic stop." Defendant reasons, "[S]ince the off-duty Paw Paw police officer cannot enforce laws within the State of

- 10 -

Illinois and is not authorized to practice law within Stephenson County, Illinois, then his efforts [cannot] be considered to be in concert with other law enforcement officers."

¶ 29 The decision by the United States Supreme Court in *United States v. Hensley*, 469 U.S. 221 (1985), belies that reasoning. In *Hensley*, two armed men robbed a tavern in St. Bernard, Ohio. *Id.* at 223. Shortly afterward, an informant told a St. Bernard police officer, Kenneth Davis, that the driver of the getaway car was Thomas Hensley. *Id.* Consequently, Davis issued a flyer announcing that Hensley "was wanted for investigation of an aggravated robbery." *Id.* The flyer, however, did not reveal why Hensley was under suspicion—the flyer said nothing about the informant's statement. See *id.* The police department in Covington, Kentucky, five miles from St. Bernard, received the flyer. *Id.* After reading the flyer or hearing it read aloud at a change of shift, a Covington police officer, Daniel Cope, pulled Hensley over. *Id.* at 224. Another Covington police officer who knew of the flyer, David Rassache, arrived at the traffic stop and recognized the passenger in Hensley's car, Albert Green, as a convicted felon. *Id.* Rassache also saw the butt of a revolver protruding from under the passenger's seat. *Id.* The Covington police arrested Green and, after finding two more pistols in the car, arrested Hensley, too. *Id.* at 224-25. Kentucky charged Hensley with violating its handgun possession law, but then Kentucky dismissed these state charges. *Id.* at 225. Then a federal grand jury indicted Hensley for violating a federal statute prohibiting convicted felons from possessing guns. *Id.* Hensley, however, moved to suppress evidence of his possession of the pistols, arguing that "the Covington police had impermissibly stopped him in violation of the Fourth Amendment and the principles announced in *Terry*." *Id.*

¶ 30 One of the questions before the United States Supreme Court in *Hensley* was this: If the officers of one police department stop a person in reliance on a flyer, issued by another police department, announcing that the person is wanted for the investigation of a felony, is the stop

reasonable under the fourth amendment, even though the flyer omits the facts that led the issuing department to suspect the person's involvement in the felony? *Id.* at 229-30.

¶ 31        In addressing that question, the Supreme Court in *Hensley* brought out an implication in one of its previous decisions, *Whiteley v. Warden*, 401 U.S. 560 (1971). See *Hensley*, 469 U.S. at 230-31. In *Whiteley*, the sheriff of Carbon County, Wyoming, obtained a warrant to arrest Harold Whiteley and Jack Daley for burglary. *Whiteley*, 401 U.S. at 563. After obtaining the arrest warrant, the sheriff sent out a radio message to pick up Whiteley and Daley for breaking and entering. *Id.* The message described Whiteley and Daley, the car in which they probably would be traveling, and the property they allegedly had stolen. *Id.* The message, however, did not divulge the probable cause for believing that these two men were the burglars. See *id.* Nevertheless, in reliance on the radio message, a Laramie police officer, in Albany County, Wyoming, pulled over and arrested Whiteley and Daley. *Id.* In the car in which Whiteley and Daley had been traveling, the Laramie police officer found the stolen property. *Id.* The questions on appeal were whether the arrest of Whiteley was unreasonable and, therefore, whether the evidence the Laramie police had obtained in the search incident to the arrest should be suppressed. See *id.* at 561.

¶ 32        For two reasons, the Supreme Court in *Whiteley* held that the arrest had violated the fourth and fourteenth amendments (U.S. Const., amends. IV, XIV) and that the evidence, therefore, should be suppressed. First, the sheriff's complaint that had provided the basis for the warrant was conclusory and devoid of any supporting facts. *Whiteley*, 401 U.S. at 565. Second, the record lacked information that the informant on whom the sheriff had relied was reliable and that the informant had good cause for implicating Whiteley and Daley. See *id.* at 567.

¶ 33    The Supreme Court in *Whiteley* was careful to add, though, that police officers could justifiably act in reliance on a law-enforcement radio announcement that someone was wanted for a crime, even if the announcement left out the supporting evidence:

> "We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing search warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Id.* at 568.

¶ 34    To the Supreme Court in *Hensley*, "[t]his language in *Whiteley* suggest[ed] that, had the sheriff who issued the radio bulletin possessed probable cause for the arrest, then the Laramie police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause." *Hensley*, 469 U.S. at 230-31. When the police arrest someone "in reliance merely on a flyer or bulletin," the admissibility of evidence that the police find in a search incident to the arrest

> "does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to see their assistance. In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other

jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction." *Id.* at 231.

¶ 35    The Supreme Court in *Hensley* anticipated an objection to using this collective-knowledge principle from *Whiteley*: in *Whiteley*, there was a warrant, whereas in *Hensley*, there was no warrant. "It could be argued that police can more justifiably rely on a report that a magistrate has issued a warrant than on a report that another law enforcement agency has simply concluded that it has a reasonable suspicion sufficient to authorize an investigatory stop." *Id.* at 232. In the Supreme Court's view, however, this distinction was unimportant. See *id.* Because the "law enforcement interests" were weighty enough to justify a traffic stop "to investigate a past crime" (given a reasonable, articulable suspicion), those same interests weighed in favor of "permitting police in other jurisdictions to rely on flyers or bulletins in making stops to investigate past crimes." *Id.*

¶ 36    Thus, in seizing Hensley's person, the Kentucky police, unaware of the underlying facts, could justifiably rely on a flyer issued by the Ohio police, provided that the Ohio police had "a reasonable suspicion, based on specific and articulable facts, that Hensley was involved in an armed robbery." *Id.* at 233. It was irrelevant that the badge of an Ohio police officer gave that officer no law enforcement authority in Kentucky. Likewise, if the Carbon County sheriff in *Whiteley* had probable cause to believe that Whiteley had been involved in a burglary, the Laramie police officer could reasonably have seized Whiteley in reliance on a radio message from the Carbon County sheriff. It would have been irrelevant that the badge of the Carbon County sheriff gave him no law enforcement authority in Laramie. It also was irrelevant, in *Hensley*, that the Kentucky police officers lacked the knowledge of the Ohio police officers. Likewise, it would

have been irrelevant, in *Whiteley*, that the Laramie police officer lacked the knowledge of the Carbon County sheriff (if the sheriff had possessed probable-cause knowledge).

¶ 37 By the logic of *Whiteley* and *Hensley*, what Ferrion knew at the time of the traffic stop counts in the assessment of reasonable suspicion, even though Aliu had not yet been apprised of what Ferrion knew. That Ferrion's badge as a Paw Paw police officer gave him no law enforcement authority in Stephenson County is irrelevant. Ferrion was in a marked squad car, and typically, squad cars are driven by police officers, who, because of their training and experience, tend to be adept at recognizing apparent DUIs. Ferrion's act of flashing his headlights as he went by Aliu, while tailing the red Jeep, was analogous to the dissemination of the flyer in *Hensley*. Under the circumstances, the clear import of this flashing signal from one police officer to another—the "rational inference[ ]"—was as follows: "Here is the red Jeep, the suspected DUI, that you are looking for. This is the guy." See *Hackett*, 2012 IL 111781, ¶ 20. As if to eliminate any possible doubt, the license plate number matched when Aliu pulled up behind the Jeep.

¶ 38 When Aliu then turned on his emergency lights, initiating the traffic stop, what Ferrion observed earlier was imputable to Aliu. "The collective knowledge of *all* of the officers involved in the apprehension of a defendant, even if such knowledge is not told to the arresting officer, may be considered by the trial court in determining whether a reasonable suspicion existed." (Emphasis added.) *People v. Green*, 2014 IL App (3d) 120522, ¶ 30. Ferrion had watched the red Jeep "driving erratically and swerving and crossing the center line [and] the fog line." He had watched the Jeep almost hit a pole and then come to a dead stop on the highway for no apparent reason, where there was no stop sign or traffic light, before the Jeep continued onward again. That the driver of the Jeep was under the influence was not a certainty. Alternatively, he could have been tired or ill, or he could have simply been a bad driver. But "[r]easonable suspicion does not

require an officer to rule out the possibility of innocent conduct." (Internal quotation marks omitted.) *Jenkins*, 2021 IL App (1st) 200458, ¶ 47. From the obviously defective driving that Ferrion observed, it was reasonable to suspect defendant of DUI, and Aliu stood on Ferrion's shoulders in that Ferrion's knowledge was imputed to Aliu.

¶ 39                                    III. CONCLUSION

¶ 40            Because the traffic stop was supported by a reasonable, articulable suspicion that defendant was driving under the influence of drugs or alcohol, we reverse the circuit court's orders granting the motion to suppress evidence and the petition to rescind the statutory summary suspension. We remand this case for further proceedings.

¶ 41            Reversed and remanded.

*People v. Whiles*, 2024 IL App (4th) 231086

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Stephenson County, No. 23-DT-21; the Hon. James M. Hauser, Judge, presiding. |
| **Attorneys for Appellant:** | Carl H. Larson, State's Attorney, of Freeport (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Jonathan James, of Law Office of Doyle and James, of Rockford, for appellee. |